LOGAN PLANING MILL COMPANY,
a corporation, Plaintiff,

v.

FIDELITY AND CASUALTY COMPANY
OF NEW YORK, a corporation,
et al., Defendants.

Civ. A. No. 1058.

United States District Court
S. D. West Virginia,
at Huntington.

Dec. 20, 1962.

William G. Wilson, Logan, W. Va., for plaintiff, Logan Planing Mill Co.

Huddleston & Bolen, William C. Beatty, Huntington, W. Va., for defendant Fidelity & Casualty Co. of New York.

Harry G. Camper, U. S. Atty., and Frank Eaton, Asst. U. S. Atty., Huntington, W. Va., and Wallace E. Maloney, Washington, D. C., for United States.

R. A. Woodall, Hamlin, W. Va., for defendant Board of Education of Lincoln County.

HARRY E. WATKINS, District Judge.

This action was brought by plaintiff to quiet title to a fund of money ($12,285.44), held by the Board of Education of Lincoln County, West Virginia, which the United States claims by virtue of a tax lien. Plaintiff, Logan Planing Mill Company, and defendant, Fidelity and Casualty Company of New York, claim the fund by virtue of an assignment in trust prior in point of time to the assessment of the tax. Many legal questions and some factual questions have been raised, but this court finds that the assignment was valid and effective, and is superior to the tax lien.

R. V. Pauley Construction Company (hereinafter called "Contractor") was the low bidder on each of three school building contracts for Lincoln County, West Virginia. The contracts were for $36,919.39, $82,537.72 and $43,983.68, respectively, and in the total amount of $163,440.79. The awarding of the contracts required the Contractor to furnish a performance and payment bond for each job in the amount of the contract price.[1] The Contractor's financial condition was such that it could not obtain a surety on the three bonds on its own credit. When it applied to defendant, Fidelity and Casualty Company of New York (hereinafter referred to as "Surety") for bonds, the Surety declined to enter into such an arrangement unless the Contractor had obtained some additional, independent, outside indemnitor which would pledge its credit and guarantee to indemnify the Surety against loss on any or all of the performance bonds. Other conditions were also imposed by the Surety, which required the Contractor to segregate the entire contract proceeds, when payable, and to designate a trustee or third party to hold such proceeds to assure the Surety and plaintiff, Logan Planing Mill (hereinafter referred to as "Planing Mill") as Indemnitor, that the contract proceeds would not be comingled with Contractor's funds and to insure that such proceeds were applied to payment of the labor and material costs on each of the three contracts. Accordingly, the Contractor made arrangements with Planing Mill, in early August, 1959, to pledge the latter's credit to the Surety as the Contractor's Indemnitor and for Dan Lassiter (who was acceptable to all parties as a reliable and independent third party) to act as assignee of the contracts' proceeds, to handle and pay out for labor and materials only, the contract proceeds which were to be delivered to him. This separate handling of the contract proceeds by Lassiter was a condition for Planing Mill's lending its credit as indemnitor. About August 17, 1959, the Board of Directors of Planing Mill authorized it to enter into these contractual arrangements and on August 19, 1959, it executed the three indemnity contracts. About the same time the Contractor executed and delivered bond application forms for the three bonds, although the application forms were not then dated. It was then understood by the parties that the Contractor would complete the details of the written assignment of contract proceeds to Dan Lassiter by procuring and delivering to the Board and to Dan Lassiter a proper written agreement. Such an assignment was prepared and executed by the Contractor as of September 2, 1959 (prepared at Contractor's request by its attorney) and a copy thereof was submitted to Planing Mill and approved by it on or about September 30, 1959, by a written memo thereon signed by W. W. Bryan for the Planing Mill and likewise approved and accepted by Dan Lassiter at the same time by his written memo on the same copy thereof, which was returned and

1. Ch. 38, Art. 2, Sec. 39, W.Va.Code, required the Board of Education to secure from the Contractor a valid and sufficient bond, conditioned upon the payment of all materials and labor used in the construction or repair of such public building, and providing that the "bond and the sureties thereon shall be responsible to such materialmen * * * and furnisher or performer of such labor, or their assigns, for the full payment of the full value thereof."

kept by the Surety. The written assignment was, in general terms, a complete assignment of all the contract proceeds under each of the three contracts, and specified the contracts and the amount thereof. The terms of the alleged trust arrangement under which Dan Lassiter was to act were agreed to by the parties verbally and were established in the oral testimony of the witnesses. The execution of the bond application, the arrangement for indemnification by Planing Mill, the designation of Dan Lassiter as alleged trustee and arrangements for his handling and payment of the contract proceeds for labor and materials, and the execution of the assignment of September 2, 1959 (which assigned to Dan Lassiter specifically and by reference to each construction contract all of the contract proceeds) were all a part of the same original transaction, although some of the details, such as the making of the written assignment, were completed at a later date. The construction contracts and the performance and payment bonds were executed by the Board of Education (hereinafter referred to as "Board" or "Owner") and by the Contractor and Surety, on August 31, 1959, and were duly recorded on September 10, 1959. The amount of the performance bonds executed by Surety was exactly the same in each instance as the amount of the construction contract.

A copy of the contract was not served upon the Board by the Contractor as he agreed to do, but the Contractor did proceed with the contracts. The contracts provided that on the 20th of each calendar month, the Board was to pay 90% of all labor and materials incorporated in the project up to the first day of that month, and the final payment of the last 10% of contract proceeds was to be paid 30 days after substantial completion, provided the work was then fully completed and the contract fully performed. Progress payment checks were made by the Board, under all three contracts, to Contractor, which endorsed the same and delivered them to Lassiter from time to time, pursuant to the assignment, beginning about September 14, 1959, to and including March 15, 1960. Payments dated May 5, 1960, and June 14, 1960, on all jobs, totalling $11,919.00, were kept and retained by the Contractor and were never delivered to Lassiter. All other payments made were delivered to Lassiter and by him deposited in his special checking account in The National Bank of Logan, at Logan, West Virginia. This special bank account was opened by him on September 18, 1959, at which time he deposited with the bank a photo copy of the executed assignment of September 2, 1959, and this special account was entitled "R. V. Pauley Construction Company, Dan Lassiter, Agent." The sum of $20.53 still remains in this account.

The Contractor presented its requisition to the trustee for payroll requirements, and Lassiter then made payments for such labor to the Contractor, and the Contractor then issued its own checks to each employee on account of that labor. Payments for material bills (less 10%) were made directly by Lassiter to suppliers. Although the construction contracts called for 10% of the contract sum to be retained to cover any defect in construction or for payment of unpaid labor and material claims, nevertheless, all of the contract proceeds had been paid out except $200 each on the Barrett Bend and Midkiff jobs, while as of June 14, 1960, all but $11,885.44 had been paid on the Hart's High School job.

The Surety, through its Richard Gainer, communicated monthly with Lassiter to insure that bills for labor and materials were being paid on time as they accrued. In May, 1960, the Surety determined that the Contractor was in default in payment of material bills, and on June 20, 1960, when Gainer visited Lassiter's office, he found that $2,240.00 was due and unpaid by the Contractor to one supplier of material. He also found that all but $200.00 had been paid out by the Board on each of two jobs. Soon thereafter, numerous unpaid material bills for materials delivered to these jobs were presented to the Surety for payment, and payment was made by the Surety. The

names of these suppliers, the dates of delivery, and dates of payment, are covered in a stipulation signed by the parties. Beginning October 21, 1960, when the first payment was made, through May 9, 1961, the Surety paid out a total of $26,-156.20 on claims for the Contractor's unpaid material bills on these three contracts. On November 17, 1961, Planing Mill, by reason of its agreements to indemnify Surety and save that Company from loss by reason of the three bonds, made a payment of $7,500.00 to Surety as part payment against losses sustained by Surety under such bonds.

The assignment of September 2, 1959, was not initially served on or delivered to the Board. Dan Lynch, and Gainer for the Surety, called on J. O. Midkiff (the Board's Superintendent of Schools) on August 25, 1960, and requested him not to pay anything further to the Contractor and advised Midkiff of the assignment. A copy thereof was sent to the Board by Lassiter with the latter's forwarding letter of August 26, 1960. By letter dated September 9, 1960, Lynch wrote Midkiff to demand that the retained proceeds be delivered to the Surety to pay for material bills, etc., purchased on these jobs. After June 14, 1960, no further progress payments were made by the Board. At the time the Board filed its answer, it had $12,285.44 in its hands to be distributed as the court might direct. After the Board filed its answer in this case, stating that it held the sum of $12,285.44 for distribution by the court, it paid out the sum of $1,-693.70 on March 13, 1961, without court order, and amended its answer accordingly to show that it now holds only $10,591.74 for distribution. This payment was made to the State Tax Commissioner of West Virginia for Business and Occupation Taxes (Sales tax), owed by the Contractor on these jobs under Ch. 11, Art. 13, sec. 16, W.Va.Code, which provides as follows:

"All state, county, district and municipal officers and agents making contracts on behalf of the State of West Virginia or any political sub-division thereof shall withhold payment in the final settlement of such contracts until the receipt of a certificate from the tax commissioner to the effect that all taxes levied or accrued under this article against the contractor have been paid. Any official violating this section shall be guilty of a misdemeanor and, on conviction thereof, shall be fined not more than one thousand dollars or imprisoned not exceeding one year in the county jail, or shall be subject to both said fine and imprisonment, in the discretion of the court."

Planing Mill and Surety concede and this court finds that this tax was superior to all claims in this case, and the court now approves of such payment. The West Virginia Supreme Court has so held in Moran v. Leccony Smokeless Coal Co., 122 W.Va. 405, 10 S.E.2d 578, 136 A.L.R. 1007; Fidelity & Deposit Co. of Maryland v. County Court of Lewis County, 123 W.Va. 409, 15 S.E.2d 302.

Hart Construction Company was engaged by the architect to finish the work on that school which had not been completed by the Contractor, and this work was done between September 16, 1961, and October 16, 1961, at a cost of $411.59, which was paid by Surety. The architect did not issue his final completion and payment certificates directing payment of the balance of the proceeds on completion of the contracts until November 30, 1961.

What are the present tax claims and when were they assessed? Since this action was started the taxpayer-contractor and the Internal Revenue Service have adjusted the earliest of the tax liabilities (1959 Corporate Income Tax, assessed July 15, 1960, in the total amount of $3,417.60), except for a non-interest bearing item of $27.96. The Government's next claim, in chronological order is that for second quarter, 1960 Withholding and FICA Taxes, which was originally in the total amount of $3,-731.23, assessed August 26, 1960, but with interest was in the amount of $4,-132.78 on March 17, 1962. The Govern-

ment's next claim in order of priority is that for the third quarter 1960 Withholding and FICA Taxes, originally in the amount of $2,783.46, plus interest, under an assessment dated December 16, 1960, but with interest was in the amount of $3,018.83 on May 17, 1962. The Government's last claim is for a balance due on 1960 FUTA Taxes, in the original amount of $1,147.26, but on May 17, 1962, was (after allowing credit for payment on April 3, 1962, of $118.00) $1,065.95, including interest to May 17, 1962. The maximum claim of the Government, under all of its claims, is $8,245.52, of which $8,217.56 is interest bearing. Since this suit was instituted, other claims have been filed by the Government for taxes, but all such claims were assessed subsequent to the filing of this suit and are not involved in this controversy. By virtue of Section 6321 and 6322 of the Internal Revenue Code of 1954, a federal tax lien attached to all "property and right to property" belonging to the taxpayer at the time the assessment was made. The Government contends that the money owing under the construction contract was property of the taxpayer to which the tax lien attached.

 The principal question for decision is the ownership of this fund held by the Board at the time the taxes were assessed and levied. The Government claims that the prior alleged assignment did not transfer title or control of the fund out of the Contractor, and that Lassiter was only serving as agent for the Contractor. With this contention I cannot agree. The Surety and Planing Mill contend, and the court finds, that the assignment transferred title to the fund to Lassiter as trustee for the benefit of Surety and Planing Mill, as well as for the benefit of the Board, which was also interested in seeing that the labor and material claims were promptly paid. The Contractor was not the owner of the fund at the time the taxes were assessed. Testimony was taken upon this issue of fact and the case was submitted to the court for decision.

It is true that witnesses referred to Lassiter many times in the oral testimony as "agent," and it is also true that the money was deposited in his name in the bank as "agent," but the courts do not look so much to the technical name given a person as they do to the relationship created by the oral and written acts of the parties, to determine the true legal position he holds. The fact that a party calls a lease a deed, or calls one who is serving as trustee as an agent, would not change the true legal situation. Substance, not form or labels, controls the nature and effect of legal instruments. Here the assignment, the need for such assignment, the purpose it was to serve, with accompanying oral arrangements, the manner in which it operated after execution, all show that there was imposed upon Lassiter fiduciary duties rather than reposing in him authority to act for a principal or to represent a principal. Lassiter was vested with title to the funds and managed them only according to the terms of his trust; that is to say, for payment of labor and material claims only. The fact that he could not and did not use the money for other purposes, that the funds were to be segregated and that Lassiter agreed to this, is evidence of the trust relationship. The record is devoid of any facts to show an agency relationship, except that Lassiter was often described as "agent."

In its brief filed in this court, the Government argues, in support of the agency relationship, that "In this indirect way, both Mill and Surety were more secure under their obligation since the Contractor would not have control of the funds and could not waste or misappropriate the funds." There can be no doubt that this is an accurate statement of exactly what was intended and was accomplished by the parties. It is equally clear that such a position is not consistent with ownership of the funds by the Contractor or mere agency on the part of Lassiter, for under mere agency, the Contractor would have the right to complete dominion and control over the funds, either in its hands or the hands of its agent, with

the right to misappropriate the funds or spend them in any way it saw fit. This was an assignment of the entire contract proceeds in trust for the purpose mentioned, and such an assignment was a condition imposed by the Surety and Planing Mill before they would agree to act for the Contractor. A trust arrangement was actually established, not only because there was a written assignment to Lassiter, but, in addition, there were trust or fiduciary duties imposed on him. A trust may be accomplished by an express declaration of trust or by circumstances indicating an intention of the depositor to place the fund irrevocably beyond his control to be used for certain purposes.

■ Reliance is also placed by the Government on a non-assignment clause in the General Conditions of the construction contracts. The condition provides that the contract shall not be assigned or sublet, nor the monies due thereunder assigned without written consent of the owner, which written consent was never obtained from the Board. The Board's answer does not contest the validity of the assignment and admits as "substantially true" all the allegations of the complaint, including detailed allegations as to how the assignment was made and the trust created. This provision was for the protection of the Board and Surety, and even if this provision was violated by the Contractor, such violation would not prevent transfer of title if the Board interposed no defense on this ground. The non-assignment provision will not avail the Government in this case. The provision is personal to the Board and could furnish the Board a defense in other circumstances, but it cannot be used by the Government for the purpose it asserts.

■ Another point raised by the Government is that if title is vested in Lassiter as trustee, this action cannot be brought by Planing Mill, an alleged beneficiary. Not only are the plaintiff and Surety trust beneficiaries and, as such, entitled to bring an equitable action, but as Surety and Indemnitor, they have equitable and legal rights whether Lassiter wishes to bring action or not. The real party in interest and the party which will be liable to the Surety for any loss it sustains is Planing Mill. Lassiter, the Board, the Surety, and all other interested parties are made parties to this action.

The Government filed a motion to dismiss, alleging that the court is without jurisdiction since this is a suit to enjoin the collection of a tax in violation of Section 7421 of the Internal Revenue Code of 1954. In opposing this motion, the parties claim that this is not such a suit as is prohibited by Section 7421; that the money held by the Board is not the property of the taxpayer-Contractor by reason of the assignment thereof by the Contractor to Lassiter, as trustee; that, therefore, this is a suit to enjoin the wrongful taking of a third person's property to satisfy a tax debt, and that such a suit is not within the prohibitions of Section 7421.

■ The cases support the position that the purpose of Section 7421 is to prevent suits by the taxpayer to contest taxability and to bar collection of the tax asserted; but that the prohibitions of Section 7421 have no applicability to suits to protect property of a non-taxpayer which the Government has seized to satisfy a taxpayer's liability. See Hubbard Investment Co. v. Brast, 4 Cir., 59 F.2d 709, 710; Adler v. Nicholas, 10 Cir., 166 F.2d 674. The court denied the motion to dismiss until it could determine whether the taxpayer owned the money held by the Board, and by reason of the decision now made it appears that this is an action to protect the property of a non-taxpayer and is not prohibited by Section 7421. Before the court ruled on the motion to dismiss, plaintiff struck from its complaint the prayer for injunctive relief, whereupon the Government joined in an agreed order, dated November 9, 1961, stating in part as follows:

"It appearing from said letter and from the pleadings in this case that all parties who have heretofore appeared herein are desirous of and

seek determination by this Court of the right, title, and interest to the funds in question, now being held by the Board of Education of Lincoln County, and that upon determination of such right, title and interest that the Court will order payment thereof to the party determined to be entitled thereto after determining the respective rights of the parties in such fund, and that no injunctive proceedings against either the United States or the Collector of Internal Revenue will be necessary, the plaintiff moved to amend its Complaint * * *,"

by striking the prayer for injunctive relief, which motion was granted and the motion to dismiss was denied.

Section 7421 was formerly Section 3224, and relates to taxpayers only. In Long v. Rasmussen, D.C.Mont., 281 F. 236, the Court stated, in speaking of Section 3224:

"The Revenue Laws are a code or system in regulation of tax assessment and collection. They relate to taxpayers, and not to nontaxpayers. The latter are without their scope."

The Rasmussen case was cited in Rothensies v. Ullman, 3 Cir., 110 F.2d 590, where the Court stated:

"We think that the section of the Internal Revenue Code which we have quoted was not intended to deprive the courts of jurisdiction to restrain revenue officers from illegally collecting taxes out of property which does not belong to the person indebted to the government."

See also Seattle Association of Credit Men v. United States, 9 Cir., 240 F.2d 906, in a case similar to this case, where the Court held that a federal district court had jurisdiction to enjoin the enforcement of a levy such as that alleged in this complaint. It was there contended, as here, that the suit was to enjoin the collection of a tax in violation of Section 7421. If the Contractor was the owner of the fund at the time of the tax assessment, then the situation would

be different. Here the complaint alleges, and the court has held, that the Contractor was not the owner of the fund when the assessments were made.

The Government also urges that this court has no jurisdiction for another reason. It says that 28 U.S.C. § 2410, only waives sovereign immunity and does not grant independent jurisdiction to bring this action to quiet title. Section 2410(a) provides:

"Under the conditions prescribed in this section and section 1444 of this title for the protection of the United States, the United States may be named a party in any civil action or suit in any district court, * * * or in any State court having jurisdiction of the subject matter, to quiet title to or for the foreclosure of a mortgage or other lien upon real or personal property on which the United States has or claims a mortgage or other lien."

It is clear that this statute does waive sovereign immunity and by its very terms contemplates that the United States will be sued as a party in the situation where it is also a lien claimant in a disputed fund. It must be read in conjunction with 28 U.S.C. §§ 1340 and 2463, the latter of which provides:

"All property taken or detained under any revenue law of the United States shall not be repleviable, but shall be deemed to be in the custody of the law and subject only to the orders and decrees of the courts of the United States having jurisdiction thereof."

In Gerth v. United States, D.C.S.D. Cal., 132 F.Supp. 894, 896, the court stated:

"Section 2463 of Title 28, United States Code, has repeatedly been held to give jurisdiction to United States District Courts in suits by a party other than the taxpayer to quiet title to property or establish priority of liens as against a claim or lien asserted by the United States against the taxpayer under any in-

ternal revenue law. In re Fassett, 1892, 142 U.S. 479, 12 S.Ct. 295, 35 L.Ed. 1087; Stuart v. Chinese Chamber of Commerce of Phoenix, 9 Cir., 1948, 168 F.2d 709; Long v. Rasmussen, D.C.Mont.1922, 281 F. 236; Rothensies v. Ullman, 3 Cir., 1940, 110 F.2d 590; [Raffaele] v. Granger, 3 Cir., 1952, 196 F.2d 620."

See also William T. Plumb, Jr., in his article on Tax Collection and Lien Problems, 13 Tax Law Review (Part 2) No. 4, p. 537, where he refers to Section 2463 and stated:

"That provision has been construed as an affirmative grant of jurisdiction to the federal courts, no independent grounds being required, to entertain any action other than replevin with respect to property levied upon."

Section 1340 of Title 28, provides:

"The district courts shall have original jurisdiction of any civil action arising under any Act of Congress providing for internal revenue, or revenue from imports or tonnage except matters within the jurisdiction of the Customs Court."

In Ersa, Inc. v. Dudley, 3 Cir., 234 F.2d 178, the Court said:

" * * * this court has also held that the district court of the district in which the property is located has jurisdiction in a proceeding such as this to determine whether a levy for federal taxes was illegally made upon property belonging to one other than the indebted taxpayer. Rothensies v. Ullman, 3 Cir., 1940, 110 F.2d 590; Raffaele v. Granger, 3 Cir., 1952, 196 F.2d 620. As pointed out in those cases that jurisdiction is derived from sections 1340 and 2463 of title 28 United States Code, which give to the appropriate district court power to make orders and decrees with respect to property taken or detained under the federal revenue laws. * * *"

See also Seattle Association of Credit Men v. United States, supra; Raffaele v. Granger, 3 Cir., 196 F.2d 620; National Iron Bank v. Manning, D.C.N.J., 76 F. Supp. 841; Szerlip v. Marcelle, D.C.N.Y., 136 F.Supp. 862; Ersa, Inc. v. Dudley, supra. For the reasons stated, there is no merit in this contention of the Government.

The Government also says that this court has no jurisdiction to quiet title to personal property because there is no action to quiet title to personal property under West Virginia law, and if there was such action, it would be necessary under West Virginia law for Planing Mill to show that it had both legal and equitable title to the fund. There is no merit in this point because this is not an action brought to quiet title under West Virginia law. It is an action authorized under Federal law, 28 U.S.C. §§ 2410, 2463, and 1340.

It is also said that the plaintiff gave no consideration. The lending of its credit and its undertaking in the written contract is a valuable consideration for the assignment.

The Government also says that the claim of Planing Mill and Surety cannot be honored because they were inchoate, citing United States v. R. F. Ball Construction Co., 355 U.S. 587, 78 S.Ct. 442, 2 L.Ed.2d 510. But this case is not analogous to Ball. Here we do not have an assignment to secure a future contingent indebtedness, but an assignment to prevent a future indebtedness, an assignment of a known, fixed sum in trust for application to particular claims. The Ball case involved assignment of retainages on a Texas project to pay for default on a Kentucky contract, where the same surety had bonded it. Four justices dissented, even there taking the position that the assignment was choate, fully executed, and had the status of a mortgage under Texas law. In Ball there was default and subsequent claim asserted, but here default was not awaited; on the contrary, the entire contract proceeds were assigned, in trust, for payment for completion of the contract, not as security for a debt; and here the Surety com-

menced payment of material claims on October 21, 1960, and paid a total of $18,367.30 on claims before the Government filed its first tax lien on November 3, 1960, a payment much more than the amount of the proceeds now retained by the Board.

In addition to the written assignment to Lassiter, as trustee, there was also an assignment in the application for these bonds by the Contractor to Surety, which was pleaded and is in evidence. The assignment to Lassiter, dated September 2, 1959, is not governed by Ball. It was specific in nature, and effect was promptly given to it by depositing money with the trustee thereunder and the immediate commencement of payment by the trustee of labor and material claims. The Government says that there is no assignment, other than that contained in the bond applications, which are inchoate under Ball and, therefore, the first two of the Government's claims are entitled to priority after which (and because of the payments made by the Surety in October and November, 1960), the Surety's equitable claim has thereby become choate so as to entitle the Surety to the balance of the fund. Even under this theory of the Government, it admits it would only be entitled to recover from the fund the first two claims of $4,132.00 with interest, and $27.96, without interest. The Government does say that the Surety has not pleaded this assignment (with which statement the court does not agree) and, therefore, the Government has a lien for all of its tax claims pleaded.

This reasoning is not logical because it completely ignores the existence of the Lassiter assignment, the testimony of witnesses, the handling of the fund by Lassiter through his account at the bank, and excludes consideration of all the other transactions, conversations and dealings of the parties. The Lassiter assignment was actually carried out and treated by the parties as immediately effective and operative, and except for the unlawful retention of a part of the fund by R. V. Pauley, the assignment in trust was fully carried out.

It is true that the Government tax lien arises as of date of assessment and attaches to all the property of the taxpayer, and any competing lien must also be perfected or choate. A lien is deemed choate when the identity of the lienor is determined and the property subject to the lien and the amount of the lien are established. The claim of the Surety here is not a lien (strictly speaking) since no contractual lien was created. This was a completed transaction in that the assignee-trustee was specifically known and designated, the amount assigned was definite, certain, in the exact amount of each contract sum, the property which was the subject of the contract was definite and known, and, of the total of $151,219.35 paid on the contracts by the Board before the Government levy, $139,300.26 was actually delivered to Lassiter under the trust arrangement, although $11,919.00 was, without right or authority, retained by the Contractor. This was, therefore, more than the ordinary security arrangement which was the subject of Ball.

The claim of Planing Mill and Surety is entitled to priority on the theory of no property in the taxpayer. But even when applying the test of "choateness," I find that the assignment will pass the test. This was an assignment in substance as well as form, and is of greater dignity than a security arrangement or a lien.

The Government has filed a cross claim against Surety, in which it claims that the Withholding and FICA taxes for the second, third and fourth quarters of 1960 are a portion of the cost of labor arising out of the three construction contracts, and that Surety should be required to pay such costs of labor. There is no merit in this contention. The Fourth Circuit Court of Appeals has held that the contractor's taxes are not payable under the bond. See United States v. Crosland Construction

Co., 4 Cir., 217 F.2d 275, in which the Court said:

"We agree with the Fifth Circuit: 'Though measured by the amount of wages, the money due the United States was owing as taxes and not as wages.' General Casualty Co. of America v. United States, 205 F.2d at page 755."

To the same effect, see United States v. Phoenix Ind. Co., 4 Cir., 231 F.2d 573; United States Fidelity & Guaranty Co. v. United States, 10 Cir., 201 F.2d 118; and United States v. Seaboard Surety Co., N.D.Tex., 201 F.Supp. 630.

The foregoing was written prior to the decision of the Supreme Court in Pearlman v. Reliance Insurance Company, 83 S.Ct. 232. There the Supreme Court held that (even in the absence of any express assignment) the Surety, which paid labor and material bills incurred by a government contractor, had ownership of an equitable lien on, or a prior right to retained percentages from the date of execution of the bond and contract on the theory of subrogation alone. Thereafter Planing Mill and Surety amended their pleadings to assert right to the fund on the additional theory of subrogation.

In Pearlman there was a dispute between Pearlman, as trustee in bankruptcy of Dutcher Construction Corporation (which in April, 1955, entered into a contract with the United States to do work on the St. Lawrence Seaway project) and the contractor's payment bond surety over which had the superior right and title to a fund withheld by the Government out of earnings due the contractor. One bond guaranteed payment to all persons supplying labor and materials for the project. The United States was authorized to retain and hold a percentage of estimated amounts due monthly until final completion and acceptance of all work under the contract. Before completion, the contractor had financial difficulties, the United States terminated

his contract, and another contractor completed the job, which was finally accepted by the Government. At this time the Government was holding $87,737.35, which would have been due to be paid to the contractor had it carried out its obligations to pay its laborers and materialmen. The surety had to pay about $350,000.00 to discharge debts of the contractor for labor and materials. The fund held by the Government was paid to the trustee in bankruptcy, who held the fund on the assumption that it had been property of the bankrupt at the time of adjudication and, therefore, had vested in the trustee "by operation of law" under Section 70 of the Bankruptcy Act. The surety then filed a petition denying that the fund had vested in the trustee, alleging that the surety was the owner of the sum free and clear of the claims of the Trustee in Bankruptcy or any other person and seeking an order directing the trustee to pay over the fund to the surety forthwith. The referee denied this request, but the District Court granted the request,[2] and the Second Circuit affirmed.[3]

The Supreme Court stated:

"One argument against the surety's claim is that this controversy is governed entirely by the Bankruptcy Act and that § 64, 11 U.S.C. § 104, 11 U.S.C.A. § 104, which prescribes priorities for different classes of creditors, gives no priority to a surety's claim for reimbursement. But the present dispute—who has the property interests in the fund, and how much—is not so simply solved. Ownership of property rights before bankruptcy is one thing; priority of distribution in bankruptcy of property that has passed unencumbered into a bankrupt's estate is quite another. Property interests in a fund not owned by a bankrupt at the time of adjudication, whether complete or partial, legal or equitable, mortgages, liens,

2. In re Dutcher Construction Corp., 197 F.Supp. 441 (D.C.W.D.N.Y.1961).

3. 298 F.2d 655 (C.A.Cir., 1962).

or simple priority of rights, are of course not a part of the bankrupt's property and do not vest in the trustee. The Bankruptcy Act simply does not authorize a trustee to distribute other people's property among a bankrupt's creditors.[10] So here if

"10. See Justice Holmes' discussion in Sexton v. Kessler & Co., 225 U.S. 90, 98–99, 32 S.Ct. 657, 659, 56 L.Ed. 995 (1912). As to the difficulties inherent in phrases like 'equitable lien,' see Glenn, The 'Equitable Pledge', Creditors' Rights, and the Chandler Act, 25 Va.L.Rev. 422, 423 (1939).

the surety at the time of adjudication was, as it claimed, either the outright legal or equitable owner of this fund, or had an equitable lien or prior right to it, this property interest of the surety never became a part of the bankruptcy estate to be administered, liquidated, and distributed to general creditors of the bankrupt. This Court has recently reaffirmed that such property rights existing before bankruptcy in persons other than the bankrupt must be recognized and respected in bankruptcy.[11] Consequently our ques-

"11. United States v. Durham Lumber Co., 363 U.S. 522, 80 S.Ct. 1282, 4 L.Ed. 2d 1371 (1960). See also Security Mortgage Co. v. Powers, 278 U.S. 149, 49 S.Ct. 84, 73 L.Ed. 236 (1928), and cases collected in 6 Am.Jur. Bankruptcy § 949 (1950). Cf. Aquilino v. United States, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960).

tion is not who was entitled to priority in distributions under § 64, but whether the surety had, as it claimed, ownership of, an equitable lien on, or a prior right to this fund before bankruptcy adjudication.

"Since there is no statute which expressly declares that a surety does acquire a property interest in a fund like this under the circumstances here, we must seek an answer in prior judicial decisions. Some of the relevant factors in determining the question are beyond dispute. Traditionally sureties compelled to pay debts for their principal have been deemed entitled to reimburse-

ment, even without a contractual promise such as the surety here had.[12] And probably there are few

"12. 'The right of subrogation is not founded on contract. It is a creature of equity; is enforced solely for the purpose of accomplishing the ends of substantial justice; and is independent of any contractual relations between the parties.' Memphis & L. R. R. Co. v. Dow, 120 U.S. 287, 301–302, 75 S.Ct. 482, 488–489, 30 L.Ed. 595 (1887).

doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed.[13] This rule,

"13. See, e. g., Hampton v. Phipps, 108 U.S. 260, 263, 2 S.Ct. 622, 27 L.Ed. 719 (1883); Lidderdale's Executors v. Robinson's Executor, 12 Wheat. 594, 6 L.Ed. 740 (1827); Duncan, Fox, & Co. v. North and South Wales Bank, 6 App.Cas. 1 (H. L.1880). See generally Sheldon, Subrogation § 11 (1882).

widely applied in this country[14]

"14. See cases collected in 50 Am.Jur. Subrogation § 49 (1944).

and generally known as the right of subrogation, was relied on by the Court of Appeals in this case."

The Court then cited with approval two prior decisions of the Supreme Court. Prairie State Bank of Chicago v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896) and Henningsen v. United States Fid. & Guar. Co., 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908), as follows:

"In the Prairie Bank case a surety who had been compelled to complete a government contract upon the contractor's default in performance claimed that he was entitled to be reimbursed for his expenditure out of a fund that arose from the Government's retention of 10% of the estimated value of the work done under the terms of the contract between the original contractor and the Government. That contract contained almost the same provisions for retention of the fund as the contract presently before us. The Prairie Bank, contesting the surety's claim,

asserted that it had a superior equitable lien arising from moneys advanced by the bank to the contractor before the surety began to complete the work. The Court, in a well-reasoned opinion by Mr. Justice White, held that this fund materially tended to protect the surety, that its creation raised an equity in the surety's favor, that the United States was entitled to protect itself out of the fund, and that the surety, by asserting the right of subrogation, could protect itself by resort to the same securities and same remedies which had been available to the United States for its protection against the contractor. The Court there went on to quote with obvious approval this statement from a state case:

" 'The law upon this subject seems to be, the reserved per cent to be withheld until the completion of the work to be done is as much for the indemnity of him who may be a guarantor of the performance of the contract as for him for whom it is to be performed. And there is great justness in the rule adopted. Equitably, therefore, the sureties in such cases are entitled to have the sum agreed upon held as a fund out of which they may be indemnified, and, if the principal releases it without their consent it discharges them from their undertaking.' 164 U.S., at 239, 17 S.Ct. at 147, quoting from Finney v. Condon, 86 Ill. 78, 81 (1877).

"The Prairie Bank case thus followed an already established doctrine that a surety who completes a contract has an 'equitable right' to indemnification out of a retained fund such as the one claimed by the surety in the present case. The only difference in the two cases is that here the surety incurred his losses by paying debts for the contractor rather than by finishing the contract.

"The Henningsen case, decided 12 years later in 1908, carried the Prairie Bank case still closer to ours. Henningsen had contracts with the United States to construct public buildings. His surety stipulated not only that the contractor would perform and construct the buildings but, also, as stated by the Court, that he would 'pay promptly and in full all persons supplying labor and material in the prosecution of the work contracted for.' [15] Henning-

"15. 208 U.S., at 410, 28 S.Ct., at 391.

sen completed the buildings according to contract but failed to pay his laborers and materialmen. The surety paid. This Court applied the equitable principles declared in the Prairie Bank case so as to entitle the surety to the same equitable claim to the retained fund that the Prairie Bank was held to have. Thus the same equitable rules as to subrogation and property interests in a retained fund were held to exist whether a surety completes a contract or whether, though not called upon to complete the contract, it pays the laborers and materialmen. These two cases therefore, together with other cases that have followed them,[16] establish the surety's right

"16. See, e. g., Martin v. National Sur. Co., 85 F.2d 135 (C.A.8th Cir. 1936), aff'd 300 U.S. 588, 57 S.Ct. 531, 81 L.Ed. 822 (1937); In re Scofield Co., 215 F. 45 (C.A. 2d Cir. 1914); National Sur. Co. v. United States, 133 F.Supp. 381, 132 Ct.Cl. 724, cert. denied sub nom. First Nat. Bank [in Houston] v. United States, 350 U.S. 902, 76 S.Ct. 181, 100 L.Ed. 793 (1955).

to subrogation in such a fund whether its bond be for performance or payment. Unless this rule has been changed, the surety here has a right to this retained fund. * * *

"We therefore hold in accord with the established legal principles stated above that the Government had a right to use the retained fund to pay laborers and materialmen; that the laborers and materialmen

had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it.[23] Consequently, since the surety

"23. See the somewhat different but closely related discussion by which Mr. Justice Cardozo, speaking for this Court, reached a similar result in Martin v. National Sur. Co., 300 U.S. 588, 597–598, 57 S.Ct. 531, 81 L.Ed. 822 (1937).

"Our result has also been reached by the Court of Claims in cases substantially like ours. Continental Cas. Co. v. United States, 169 F.Supp. 945, 145 Ct.Cl. 99 (1959); National Sur. Corp. v. United States, 133 F.Supp. 381, 132 Ct.Cl. 724, cert. denied sub nom. First Nat. Bank [in Houston] v. United States, 350 U.S. 902, 76 S.Ct. 181, 100 L.Ed. 793 (1955); Royal Indemn. Co. v. United States, 93 F.Supp. 891, 117 Ct.Cl. 736 (1950). See generally Speidel, 'Stakeholder' Payments Under Federal Construction Contracts: Payment Bond Surety vs. Assignee, 47 Va.L.Rev. 640, 646–648 (1961); note, Reconsideration of Subrogative Rights of the Miller Act Payment Bond Surety, 71 Yale L.J. 1274 (1962); comment, 33 Cornell L.Q. 443 (1948).

in this case has paid out more than the amount of the existing fund, it has a right to all of it. On this basis the judgment of the Court of Appeals is affirmed.

"Affirmed."

One justice dissented, and three others joined in a concurring opinion in which they reached the same result as the majority, but said that the surety is subrogated to the rights of the United States instead of being subrogated to the rights of laborers and materialmen.

In the Prairie Bank case, the bank had advanced money to pay the contractor for labor and material, and it was urged that the bank had an equitable lien upon the ten percent retained by the government paramount to any lien in favor of the surety, whose lien, it contended, only arose from the date of the surety's later advances made to pay labor and material claims upon the contractor's default. The Court held that the surety's subrogation must be considered as arising from and relating back to the date of the original contract and does not take its origin solely from the date payments were made by the surety.

Notwithstanding the decision in Pearlman, which involved a federal construction contract, it would still seem to be the law that with reference to private or state construction contracts, what constitutes property of the taxpayer is determined by state law. Once the tax lien has attached to the taxpayer's state-created interests, we go to federal law to determine the priority of competing liens asserted against the taxpayer's property or right to property. Aquilino v. United States, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365; United States v. Bess, 357 U.S. 51, 78 S.Ct. 1054, 2 L.Ed.2d 1135, and United States v. Durham Lumber Co., 363 U.S. 522, 80 S.Ct. 1282, 4 L.Ed.2d 1371.

But whether we look to federal law or state law in deciding the property rights created in Planing Mill and the Surety under the facts of this case, we reach the same conclusion because I believe that West Virginia law is no different from the federal law set forth in Pearlman.

The Prairie Bank case and the Henningsen case, relied upon in the recent Pearlman case, were each cited with approval, under similar facts, by the Supreme Court of West Virginia as early as 1927 in State for Use of E. I. Du Pont de Nemours & Co. v. Coda, 103 W. Va. 676, 138 S.E. 324. After citing these cases and others, the Court said: "Under the principles of these cases, and under the public policy gathered from our statutes above referred to," the Court proceeded to hold that a contractor could not divert by assignment the money due him under his contract and bond to the detriment of the materialman and his surety who obtained superior equitable rights upon execution of the bond and contract.

In the Coda case, the Du Pont Company, a materialman on a State Road Commission project brought suit against the contractor and surety on its bond for $2,637.15. The surety answered in the nature of a cross-bill, bringing in as parties certain persons holding assignments on a retainage fund held by the Commission, made the Commission a party, alleged that the money held was a a trust fund in its hands to protect the surety, that there were conflicting claimants to the fund, set up that in the application of the contractor for its surety bond, the contractor had assigned all funds to become due it from the Commission for the protection of the surety; charged that the attempted assignments later given were without effect and void in so far as the surety was concerned. One of the assignees, Riley, filed an answer in which he claimed that the contractor was unable to meet its pay rolls in 1924; that he loaned it money which was used to meet such pay rolls on the road construction contract under a contract that he would be repaid out of moneys due and to become due from the Commission, as evidenced by an assignment of December 24, 1924, which he immediately filed with the Commission. He denied that the assignment in the application was valid and, if valid, it was never filed with the Commission and could not take preference over his assignment. The master commissioner to whom the case was referred held that the materialmen were entitled to the fund by virtue of the "bond and the law," the Court confirmed such holding, and on appeal the Supreme Court affirmed, using the following language:

"The law requires a bond to be taken to insure the performance of a road contract, and the assignee of the contract must take notice of that bond and its conditions. A surety has the right to stand upon the express terms of his agreement, and any change by his principal and the obligee in the contract to insure the performance of which he has become surety, without his consent, to his detriment or disadvantage, will relieve him from liability on the bond. Miller v. Stewart, 9 Wheat. (22 U.S.) 680, 6 L.Ed. 189."

The Supreme Court of West Virginia continued in Coda as follows:

"In the discussion of the equities as between Riley and the surety, the fact must not be overlooked that the materialmen (Du Pont and Standard Oil) have rights which must be protected and which are accorded in the decree. What claim or equity do these materialmen have to the fund? The road law (section 25, c. 43, Code) requires the commission to take a bond from the successful bidder on a road project, not to exceed one-half the contract price; and section 12, c. 75, Code, requires public legal bodies, such as the board of control, county courts, and the like, having authority to contract for the erection of any public building or other structure to be used for public purposes, to take a bond conditioned that, in the event the contractor shall fail to pay in full for material and labor used by him, then the contractor and surety therein shall become responsible to the materialmen and laborers for the full amount of such material and labor. A permanently improved highway is a 'structure,' within the meaning of this act. State ex rel. [West Virginia] Sand & Gravel Co. v. Royal Indemnity Co., 99 W.Va. 277, 128 S.E. 439, 43 A.L.R. 552. The public policy of this state is to secure payment to the materialmen and laborers in the building of structures to be used by the public. These two statutes must be considered together. The commission recognized this requirement of the law, and the bond taken by it in this case is conditioned not only that the contractor shall well and truly perform the contract and save the state harmless, but 'shall well and truly pay all and every person furnishing material or performing labor' in the construction of the

roadway, for which the contractor is liable. * * *

"Can the contractor, or the corporation standing in his shoes, divert by assignment to a general creditor the money due him under his contract and bond, to the detriment of the materialman and his surety? The contractor agreed with the commission that it would pay the materialmen. The provision for retaining moneys in the hands of the commission was for the benefit of the commission, and it was the duty of the commission to see that the fund so retained was used to discharge the obligation of the bond. Prairie State Nat. Bank [of Chicago] v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412. A similar situation arose in Ill. Surety Co. v. City of Galion (D.C.) 211 F. 161. There a construction company contracted with the city to build a sewer disposal plant, and gave bond, which provided, among other things, that the construction company should pay for materials and labor used in the work. Later the construction company agreed with a bank that it would furnish money to enable it to pay its workmen, and the money received from estimates paid by the city should be applied to repayment of the money loaned. The surety was notified of the making of this contract, but made no response. Upon the final estimates coming in, the bank claimed the fund under the contract assigning the estimate money to it and as subrogated to the rights of the laborers. The surety company asserted that the fund was subject to the payment of the materialmen's claims remaining unpaid, and that its equity was superior to that of the bank. The court held that the equity of the surety company was superior to that of the bank (which was a creditor), and that the surety was subrogated to the right of the contractor to the fund, but that the bank was not, and decreed that the fund be first applied to the liquidation of the unpaid claims of the materialmen and laborers, and that the residue, if any, be paid the bank. In the present case, the materialmen are directly seeking payment from the fund under the provisions of a similar bond. Chancellor Day, who wrote the opinion in the Illinois Surety Company Case cited Henningsen v. United States Fidelity & Guaranty Co., 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547, Prairie State Bank v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412, and United States [to Use of Fidelity Nat. Bank] v. Rundle (C.C.A.) 107 F. 227, 52 L.R.A. 505. These citations sustain Judge Day's opinion.

"Under the principles of these cases, and under the public policy gathered from our statutes above referred to, we are of the opinion that the Du Pont Company and Standard Oil Company claims against the fund are superior in equity to that of the appellant, who was a mere creditor, and therefore the decree giving them preference will not be disturbed. The question of the superiority of Riley's assignment in 1924 over that of the assignment claimed by the surety in the application made for the bond in February, 1923, is not controlling, and is of little importance."

It is significant that the Court did not base its opinion upon the written assignment, but upon the equitable right created in the surety upon execution of the contract and bond by reason of subrogation, as pointed out in point two of the Court syllabus, which reads as follows:

"In such case the equities of the surety on the contract bond, under its right of subrogation to the rights of the contractor, are superior to the money lending creditor, who is only entitled to be paid under his assignment the remainder of the

fund after paying the materialmen and laborers for whose claims the surety has become liable under the contract bond."

In commenting on the Pearlman and Coda cases, the Government admits that Coda "states a theory of law very similar to that set forth by the Court in the Pearlman case," but says that the theory of Coda is severely restricted by the later case of Fidelity & Deposit Co. of Maryland v. County Court of Lewis County, 123 W.Va. 409, 15 S.E.2d 302. I cannot agree. I believe that the Fidelity & Deposit Co. case can be distinguished on the facts. In that case the contractor had entered into a contract with the defendant for the construction of a jail and had given the required public construction bond with the plaintiff as surety thereon. After a time the contractor defaulted after it had been paid $55,000.00 out of the total price of $62,450.00. The County Court withheld a portion of the money under the terms of the agreement which allowed it to withhold a percentage of the amount due, and while that amount was held the State of West Virginia filed notice of lien for non-payment of the contractor's gross sales price under Code 11–13–12. The plaintiff's surety brought suit and the County Court intervened. The Circuit Court of Lewis County found that the surety was entitled to be subrogated to the funds in the hands of the County Court and was a superior claim to the gross sales tax. Upon appeal the Court held that under our gross sales statute the tax is a lien on all property of the taxpayer, including its contracts and amounts receivable thereunder and that such a lien has priority over the subrogation rights of the surety. The Court went on to say that the surety, while subrogated, in this case is not subrogated to rights of laborers or materialmen under lien claims because under the statute involved here requiring the bond and contract to be filed, materialmen and laborers do not have any mechanic's lien rights. In any event, it is also said that the statute takes a priority over mechanic's lien rights because the statute gives it such a priority. This case was decided under the former Gross Sales Tax Lien Statute, which was enacted in Chapter 106, Acts of the Legislature, 1937, Effective March 13 of that year as Code 11–13–12, and which read as follows:

"A tax due and unpaid under this article shall be a debt due the state. It shall be a personal obligation of the taxpayer and shall be a lien upon all property used in the business or occupation upon which such tax is imposed and said lien shall have priority over all other liens and obligations except those due the United States."

It is true that the Court held that the retained fund was "property" of the contractor upon which the gross sales tax lien attached, but such result was reached because of the particular language of this statute making the tax a "lien upon all property used in the business or occupation upon which such tax is imposed and said lien shall have priority over all other liens and obligations except those due the United States." Of course, this language expressly subordinated all rights of materialmen, laborers, sureties or indemnitors, whether created by subrogation, assignment or otherwise. This language in the statute at the time the contract and bond were executed was binding on every one to the same extent as though the words were in the contract and bond when executed. And this is just as it should be, because it would be most unreasonable to hold that the earned income from the contract, out of which a major portion of the taxpayer's total income is derived, should be held exempt from this gross income tax because the income never became the property of the taxpayer. The Court said, at pages 303 and 304 of 15 S.E.2d:

"In most instances the contract is the one thing that enables the taxpayer to carry on his activities, and to say that accruals of earnings thereunder are not property and subject to the tax imposed on the gross

income of the business is not, in our opinion, a *reasonable construction of the statute under consideration.* Furthermore, this being a tax imposed on income, it is logically the first subject of the tax, and in no event can be held exempt from the lien on property which the statute imposes." (Emphasis supplied)

The holding in the Fidelity & Deposit Co. case is not contrary to Pearlman or Coda. It is authoritative law only upon the facts and the construction of the statute there involved, and, at most, would be dictum as to other facts and other statutes. Full recognition and approval is given to Coda, but the opinion points out that Coda is not applicable where this gross sales tax statute is involved. The effect of the decision is to recognize the well-established theory of subrogation in Coda and to hold that these funds are property within the meaning of this particular statute, basing such conclusion upon sound public policy and the construction of this statute.

The Court also pointed out that:

"Every person who engages in the business of contracting in this state is subject to a burden in the form of a tax on the gross income of his business. When he enters into a contract, he must do so in the light of that burden, and so long as each pays the tax imposed there is no discrimination and all stand upon an equal plane."

The Court cited Coda with approval as follows:

"It is true that appellee paid in wages and for materials an amount in excess of any sum due the contractor from the county court on the completion of the work, and undoubtedly under the principle of subrogation would be entitled to be subrogated to the rights of laborers and materialmen for any amount so paid to them. This is held in State [for Use of E. I. Du Pont de Nemours & Co.] v. Coda, 103 W.Va. 676, 138

S.E. 324; Capon Valley Bank v. State Road Commission, 111 W.Va. 491, 163 S.E. 44. This being a public building, coming within the terms of Code, 38–2–39, the laborers or materialmen could not acquire a lien upon the public structure, but they are protected under the bond required by said statute, and under the cases above cited, and general law, the surety on the bond executed thereunder would be entitled to be subrogated to their rights."

It is my opinion that Coda is still the law of West Virginia, and that under it Planing Mill and Surety are entitled to the fund on the theory of subrogation, in addition to their rights under the assignments.

Ball is not pertinent to this case because there the question was one of priorities, not one of ownership of the fund. In Ball the assignment was of a subcontractor to his surety as collateral security, not only for performance of its subcontract, but for the "payment of *any other indebtedness* or liability of the [subcontractor to the surety] * * *." There the subcontractor incurred other indebtedness not connected with the subcontract and completely independent of the subcontract. Under the broad language of the assignment, as collateral to secure the "payment of any other indebtedness or liability of the [subcontractor to the surety]," the surety claimed the fund under the theory that the assignment constituted a "mortgage" within the meaning of Section 3672(a) of the Internal Revenue Code of 1939, as amended, giving the surety a priority over subsequent tax liens. The Government asserted a superior right to the fund under its tax liens. Several creditors of the subcontractor, holding unpaid claims for material furnished and used in performing the subcontract, asserted priority to a portion of the fund over the claims of both the surety and the Government. Before conclusion of the trial, the materialmen's claims were satisfied. The court merely held that the tax claim

was entitled to priority because under the facts of that case, the assignment was "inchoate and unperfected." Under these facts it is quite obvious why the Supreme Court in the recent case of Pearlman v. Reliance Insurance Company made no reference whatever to Ball. It did not involve the property rights of unpaid laborers or materialmen. The claim asserted by the surety did not even involve the subcontract under which the bond was given. It did not involve the question of subrogation, or whether the surety was subrogated to the rights of the governmental agency or to the rights of the materialmen and laborers, the point over which the court divided in the Pearlman case.

■ In its cross claim the Government has claimed judgment against the Contractor for the full amount of taxes due it. The Contractor has not appeared or answered this claim. The Government has filed the proper affidavit seeking default judgment. It is entitled to such default judgment, and judgment will be entered for the full amount of taxes due it, plus interest, upon presentation of proper order.

Surety has already been required to pay and has paid for labor and materials, by virtue of the obligations in its bonds, far in excess of the sum of money now held by the Board. Planing Mill is liable to the Surety as indemnitor for all of such money. In its counter-claim against Planing Mill, the Surety asks for judgment against Planing Mill for the sum of $25,751.04 for its losses and expense incurred to date of the filing of its amended counter-claim (March 31, 1961), and for the amounts owed by it under these three bonds as yet unpaid, but claimed by persons and firms set forth in its counter-claim. Planing Mill asks that whatever amount it or Surety recovers in this action that the same be applied to the payment of Surety by way of reimbursement to it and as credit on such sums as it may have properly expended by virtue of its suretyship, and owed to it by Plan-

ing Mill as indemnitor. In its answer to such counter-claim, Planing Mill joins in such prayers for relief. Therefore, the order of this court will direct the payment of the money now held by the Board to be paid directly to the Surety for application as set forth above. Undetermined matters make it necessary that this case be retained on the docket for further orders to be entered herein.

I see no merit in other points raised by the Government. Since I am of opinion that the issues presented should be determined favorably to plaintiff and Surety, the claims of the United States are denied.

The statements above are adopted as the findings of fact and conclusions of law of this court.