**UNITED STATES of America**

v.

**COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF HIGHWAYS, Defendant and Third-Party Plaintiff,**

v.

**NATIONAL SURETY CORPORATION, Third-Party Defendant (as to Commonwealth of Pennsylvania),**

v.

**SAUL, EWING, REMICK AND SAUL, Third-Party Defendant (as to National Surety Corporation) and the Hanover Insurance Company, Third-Party Defendant (as to National Surety Corporation), et al. and J. Paul Martin, Trustee in Bankruptcy of O'Brien & Redmond, Intervenor.**

**Civ. A. No. 70-3538.**

United States District Court, E. D. Pennsylvania.

Oct. 3, 1972.

**1374**

John F. Penrose, Asst. U. S. Atty., Philadelphia, Pa., for U. S. A.

Edward A. Hosey, Asst. Atty. Gen., Dept. of Transp., Harrisburg, Pa., for Commonwealth of Pa.

Paul J. Donnelly, Philadelphia, Pa., for National Surety Corp.

Norman R. Bradley, Philadelphia, Pa., for Saul, Ewing, Remick & Saul, third-party defendant.

Melvin Lashner, Adelman & Lavine, Philadelphia, Pa., for J. Paul Martin.

Herbert A. Barton, Swartz, Campbell, & Detweiler, Philadelphia, Pa., for The Hanover Ins. Co.

## OPINION AND ORDER

BRODERICK, District Judge.

Presently before this Court are Motions for Summary Judgment filed by all parties in the above-captioned matter pursuant to Rule 56 of the Federal Rules of Civil Procedure. After having fully considered the pleadings, the stipulation of facts of the parties hereto and the memoranda of law in support of these motions, this Court has determined that there is no genuine issue as to any material fact and that certain of the parties are entitled to judgment as a matter of law.

This civil action was commenced on behalf of the United States of America (hereinafter referred to as Federal Government) against the Commonwealth of Pennsylvania, Department of Highways (hereinafter referred to as State) for failure to honor a levy for unpaid taxes. State, in turn, sued the National Surety Corporation (hereinafter referred to as National) because National is the party to which State paid the funds upon which Federal Government now claims a valid levy. National then sued two entities to which a portion of the funds, which it had received from State, had been paid, to wit, a partnership of lawyers, Saul, Ewing, Remick and Saul (hereinafter referred to as Saul, Ewing), and a surety company, Hanover Insurance Company (hereinafter referred to as Hanover). J. Paul Martin (hereinafter Trustee), Trustee in Bankruptcy of James J. O'Brien and Daniel L. Redmond, Jr. Ind. and t/a O'Brien and Redmond (hereinafter referred to as O'Brien and Redmond), then intervened in this action claiming not only title to the fund upon which Federal Government claims a valid

levy but also claiming title to all other funds which National received from State as the balance due on certain contracts between State and O'Brien and Redmond.

In essence, this action involves nine contracts between State and O'Brien and Redmond and the issues presented this Court are which entity or entities have the right to the proceeds from these contracts.

During the years of 1958 to 1961, State entered into nine contracts with O'Brien and Redmond for improvement of certain sections of highways and/or bridges. These nine contracts were for Delaware County, Beaver County, Erie County, Wyoming-Susquehanna County, Bradford County, Somerset County-Route 55144, Somerset County-Route 55028, Cambria County and Bedford County. Hanover was the surety on labor and material bonds for the Delaware and Beaver County contracts; Globe Indemnity Co. (hereinafter referred to as Globe) was surety on a labor and material bond for the Erie County contract; and National was surety on labor and material bonds for the remaining six contracts. O'Brien and Redmond completed all of the work which was required to be performed in connection with all of the above-described contracts but failed to pay certain claims for labor and materials in connection with each of the above-described contracts. O'Brien and Redmond were declared bankrupt. The balance due on all nine of the contracts was paid by State to National; Trustee now claims the right to all of these proceeds, while Federal Government claims the right to the proceeds paid by State to National on only the Delaware, Beaver and Erie County contracts.

Each of the contracts entered into between the State and O'Brien and Redmond were identical in form and contained the following provision, as set forth in pertinent part, in respect to payment of labor and material claims by O'Brien and Redmond:

2. The *contractor* further *covenants* and agrees that all of said work and labor shall be done and performed in the best and most workmanlike manner and that *prompt payment will be made in full for labor and materials used in the work,* and that all and every of said materials and labor shall be in strict and entire conformity, in every respect, with the said specifications and drawings and shall be subject to the inspection and approval of the chief engineer of the Department of Highways . . . (emphasis added).

. . . . . .

8. The bond, given by the contractor, in a sum equal to fifty (50) per centum of the total contract price of the work to be done, to secure a proper compliance with the terms and provisions of this contract and as well as the Additional Bond in like sum for the prompt payment in full of labor and material are hereto attached and made a part hereof.

9. All questions or disputes, where the aggregate amount of such claims exceeds three hundred dollars ($300.-00), respecting any matter pertaining to this contract or any part thereof or any breach of said contract shall be referred to the Board of Arbitration

. . . .

All of the labor and material payment bonds, on which O'Brien and Redmond was the principal, the State was the obligee, and either National, Hanover or Globe were the sureties, furnished in connection with the above-described contracts were identical in form. The labor and material bonds provided in part that:

The condition of this obligation is such that if the above bounded principal shall and will promptly pay or cause to be paid in full all sums of money which may be due any person, co partnership, association, or corporation for all material furnished and labor supplied or performed in the prosecution of the work, whether or not the said material or labor enter into and become component parts of the work or improve-

ment contemplated . . . then this obligation to be void, otherwise to remain in full force and effect.

. . . . . .

Recovery by any person, co partnership, association, or corporation hereunder shall be subject to the provisions of the Act of June 22, 1931, P.L. 881, which Act shall be incorporated herein and made a part hereof, as fully and completely as though its provisions were fully and at length herein recited.

The bonds of National were executed in reliance on and in consideration of a General Indemnity Agreement executed by O'Brien and Redmond as Indemnitors and delivered to National as Surety on September 26, 1960. The General Indemnity Agreement provides as follows in pertinent part:

4. If any such bond be given in connection with a contract, the Surety in its sole discretion is hereby authorized . . . (c) *in the event of any* default in the performance of the contract, or the breach of any bond connected therewith, or the *failure to* diligently prosecute the work under the contract or *pay for labor and materials used in the prosecution of the contract,* to take possession of the work under the contract, . . . and to take any other action which the Surety may deem appropriate.

5. The Indemnitors hereby assign, transfer, pledge and convey to the Surety (effective as of the date of such bond, but only in the event of default, breach or failure as referred to in preceding Section 4) all of their rights under the contract, including their right, title and interest in and to (1) all subcontracts let in connection therewith and such subcontractors' surety bonds, . . . and (3) any and *all sums due or which may thereafter become due under such contract and all sums due or to become due on all other contracts, bonded or unbond-* *ed, in which the Principal or Indemnitors have an interest* (emphasis added).

National filed Financing Statements on May 17, 1962 and July 9, 1962, under provision of the Uniform Commercial Code (hereinafter referred to as U.C.C.), covering the assignments to National of all of the right, title and interest of O'Brien and Redmond in the construction contracts between O'Brien and Redmond and the State dated May 23, 1961 and June 7, 1961, in Somerset, Bedford, Cambria, Susquehanna-Wyoming and Bradford Counties, and all money or payments which might be or become due O'Brien and Redmond at the time of any breach or default of these contracts on account of the contracts or on account of extra work or materials supplied therewith, as more fully set forth in the General Indemnity Agreement dated September 26, 1960.

In an action by O'Brien and Redmond against State before the Board of Arbitration of Claims of the Commonwealth of Pennsylvania (hereinafter referred to as Board of Arbitration) O'Brien and Redmond, on April 19, 1963, set over and assigned to National with National's right to collect same, any award that might be made to O'Brien and Redmond in this action. National then filed Financing Statements under provision of the U.C.C. on May 7, 1963 and May 10, 1963, which covered this Assignment of Claim.

On the Somerset-55144, Somerset-55028, Bedford, Cambria, Wyoming-Susquehanna and Bradford County contracts, the total amounts paid by National for labor and material claims are: (a) Prior to O'Brien and Redmond Bankruptcy: $130,085.10 and (b) To Date: $159,629.54. On the Somerset-55144, Somerset-55028, Bedford, Cambria and Bradford County contracts, the total amount paid by National for labor and material claims where the labor and material furnished was on a date prior to

March 25, 1962 was approximately $42,-498.97.[1]

On March 4, 1966, State paid $110,-946.04 to National, which amount was the sum of the contract balances on the nine above-described contracts. On the Delaware County contract, State paid to National the sum of $18,679.36 which was the balance due on this contract; after National's payments to Hanover and to Saul, Ewing, the balance of money in the possession of National on this contract is $12,334.05. On the Beaver County contract, State paid to National the sum of $23,836.00 which was the balance due on this contract; after National's payments to Hanover and to Saul, Ewing, the balance of money in the possession of National on this contract is $0.00. On the Erie County contract, State paid to National the sum of $10,477.77 which was the balance due on this contract; after National's payments to Saul, Ewing, the balance of money in possession of National on this contract is $9,-877.77. Therefore, the total amount of money in the possession of National from the three-county contracts not bonded by National is $22,211.82. However, it can readily be seen that National's collection of the $110,946.04 minus payments which it made to the claimants on the Delaware, Beaver and Erie County contracts still leaves National approximately $79,464.-81 short of the $159,629.54 which it has to date paid out on the six contracts which it bonded for O'Brien and Redmond.

Inasmuch as there are two claimants to the funds now in National's possession, we will discuss first the interest of the Trustee in the funds from all nine of the above-described contracts and then we will discuss Federal Government's interest in the funds from the Delaware, Beaver and Erie County contracts.

1. This amount is the sum of the amounts listed under the individual contracts for this item, however, the sum of these amounts as stipulated to by the parties in Stipulated Exhibit G–9 is $39,113.00. This difference in fact, however, does not affect our legal conclusions.

## I. TRUSTEE

The Complaint of the Trustee was filed before this Court on December 8, 1971. Therein, the Trustee has alleged: that, although defendant surety (National) and the other sureties were required to and did pay over to certain subcontractors, materialmen and laborers various amounts of monies, all claims of subcontractors, materialmen and laborers have not been paid to date; that certain taxes have not been paid; that at the time the petition in bankruptcy was filed the State owed funds to O'Brien and Redmond for work performed on the nine contracts; that plaintiff Trustee under Section 70 of the Bankruptcy Act, as amended 11 U.S.C. § 110, has title to the funds in the amount of $114,616.55[2]; that the State paid over to defendant surety (National) the sum of $114,616.-55 for which the State holds an indemnity bond against National; that National unlawfully received the money; that when the money was still in the hands of State only the Federal Government was entitled to the money; that National has unlawfully appropriated the bankrupt's property since State owed the money to the Trustee; that National is a trustee ex maleficio of the said funds in favor of the Trustee; and that, therefore, judgment should be entered against the defendant, National, and in favor of the Trustee in the amount of the $114,616.55. National has denied the existence of any such indebtedness to the Trustee.

We find no merit to Trustee's allegation that all claims of subcontractors, materialmen and laborers have not been paid to date. The Federal Government, State, National, Hanover and Saul, Ewing have all stipulated that there are no suits pending against National, Globe or Hanover (the three sureties on the aforesaid nine contracts)

2. Subsequent to the filing of this Complaint, the parties stipulated that the amount actually paid by Commonwealth to National was $110,946.04.

by any person who claims to have supplied or furnished labor or materials to any of the nine aforesaid county contracts. No such pending suit has been called to our attention by the Trustee. Moreover, no suit could now be filed by any person for claims on labor and materials under any of the aforesaid contracts. The Commonwealth of Pennsylvania's Act of December 20, 1967, P.L. 869 [3], which repealed [4] the Act of June 22, 1931, P.L. 881 [5] only insofar as the latter act was inconsistent with the former, provides that any person suing on a bond for the payment of material furnished and labor supplied or performed in the prosecution of any public work shall commence suit not later than one year from the day on which the last of the labor was performed or material was supplied upon which he brings suit for payment. This provision was specifically made a part of the labor and material bonds. If we use the date of the final certificate approval on each contract [6] as the date beyond which no labor would have been performed or material supplied to the contract, or even if we used the date of final settlement on the contract,[7] it is clear that the time for filing suits against National, or any of the other sureties on these contracts, has

long since expired. A limitation in respect to the time in which a suit may be filed is a condition precedent to the action itself, because the limitation on such a liability becomes a part of the right conferred.[8] Since any claims would now be barred by the one year limitation, there can be no unpaid claims as a matter of law. Moreover, even if there were unpaid claims, the materialmen's sole right for reimbursement would be an action on the bond against the Surety and the fact that there was a failure by the surety to pay a claim would not, in and of itself, defeat the surety's right to subrogation, and thus create priority to a trustee in bankruptcy, on account of amounts it already had paid out on the labor and material claims, to the extent of the funds which it now holds.[9]

We next turn to Trustee's allegation that at the time the petition in bankruptcy was filed the State owed funds to O'Brien and Redmond for work performed on the contracts and that the Trustee has the right of possession, title and interest in said funds by virtue of Section 70 of the Bankruptcy Act.

National was surety on six of the nine contracts entered into between the bankrupts and the State.[10] The Petition in

---

3. 8 P.S. § 191 et seq. This Act provides, in pertinent part, that:
 (b) No such action (on a payment bond) may be commenced after the expiration of one year from the day on which the last of the labor was performed or material was supplied for the payment of which such action is brought by the claimant.
 8 P.S. § 197.

4. 8 P.S. § 200.

5. Time to bring suit under this Act was stated to be as follows, in pertinent part:
 [A]nd every such suit shall be commenced not later than one (1) year from the date of final settlement under the said contract with the Commonwealth . . . . .
 53 P.S. § 1295.

6. Final certificate approval on the six contracts bonded by National occurred from May 2, 1963 to January 2, 1964. Final certificate approval on the three

contracts not bonded by National occurred from October 1, 1963 to January 9, 1964.

7. Final settlement on the contracts would have occurred on March 4, 1966, the date when State paid to National the amount of $110,946.04 as the sum of the contract balances due on the nine contracts.

8. See United States ex rel. Soda v. Montgomery, 253 F.2d 509 (3rd Cir. 1958); Commonwealth to use v. Piel Construction Co., 284 Pa. 64, 130 A. 261 (1925).

9. United Pac. Ins. Co. v. United States, 319 F.2d 893, 162 Ct.Cl. 361 (1963); Continental Cas. Co. v. United States, 164 Ct.Cl. 160 (1964).

10. The contractor, O'Brien and Redmond, was required by Pennsylvania law to have a surety for the prompt payment of all material and labor supplied or furnished on the contract. 53 P.S. § 1292, repealed in part, 8 P.S. § 200; 8 P.S. § 193.

Involuntary Bankruptcy was filed against O'Brien and Redmond on December 11, 1963, with the adjudication of the bankruptcy being declared on December 30, 1963. State did not pay over to National the sum of the contract balances until March 4, 1966. Prior to the bankruptcy, however, National had already paid out substantial monies on the six contracts for labor and material claims, to wit, $130,085.10. Moreover, the amount of each said payment by State to National on every individual contract was less than the total amount for labor and material claims which were paid by National to claimants on every individual contract either prior to the bankruptcy or to date. On September 26, 1960, furthermore, a General Indemnity Agreement had been executed by O'Brien and Redmond and delivered to National wherein the indemnitors had assigned, transferred, pledged and conveyed to the Surety, in the event of a default in the performance of the contract or the breach of any bond connected therewith, all right, title and interest in and to all sums due or which might thereafter have become due under the contract. While O'Brien and Redmond completed the necessary work on these contracts, it failed to pay many of the claims for labor and materials in connection with the contracts. In the contracts entered into between State and O'Brien and Redmond, the latter had specifically covenanted that prompt payment would be made in full for all of the labor and materials which it had used in the work under the contracts.

National had subrogation rights on each of the six contracts on which it was the surety on the labor and material bonds. The equitable doctrine of subrogation is derived from the civil law, and applies to persons, such as sureties,[11] who have paid a debt due to a third party for which another was primarily answerable, and who pays the debt not as a volunteer but because he is secondarily liable for the debt.[12] When O'Brien and Redmond did not promptly pay the labor and material claims arising from the contracts, National, as surety of these contracts, became legally liable for the payments of those claims and, thus, was entitled to subrogation [13] and, therefore, entitled to the money in the possession of State, which was the balance due on the O'Brien and Redmond contracts, ahead of any claim by Trustee.

The law of the Commonwealth of Pennsylvania, under which terms these contracts were made, supports this view. Lancaster County Nat'l Bank's Appeal [14] involved a contest between an assignee of the contractor (for future payments to be made under the contract) and the surety which had paid the labor and material claims. That Pennsylvania court, in its interpretation of a statute, contract and bond with provisions similar to those in the case at hand, held that the surety was entitled to assert the equitable doctrine of subrogation and, thus, was entitled to the contract balance.

In Sundheim v. Philadelphia School Dist.[15] where the question before the Pennsylvania court concerned the right of a surety, who had paid labor and materialmen claims, to funds in the hands of the owner as against the claims of other creditors, that court stated:

> The Legislature has . . . seen fit to protect labor and materialmen engaged by a contractor in the erection of public buildings or doing public work, by requiring the contractor to give a bond to protect them.
>
> . . . Under federal statutes a single bond is required which must provide for the completion of the contract and the payment of labor and materialmen. . . . It has been

---

11. Henningsen v. United States Fidelity and Guar. Co., 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908).

12. Prairie State Nat. Bank v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896).

13. *See generally,* 4 A. Corbin, Corbin on Contracts, § 901 (1951).

14. 304 Pa. 437, 155 A. 859 (1931).

15. 311 Pa. 90, 166 A. 365 (1933).

# 1380

held by federal courts that there is a direct contractual obligation to the government as a party to the contract, binding on the contractor and surety, to pay labor and materialmen. Consequently, when the contractor fails to pay labor and materialmen, it is tantamount to a breach of its contract with the United States government. When this occurs and the surety pays the labor and materialmen, it stands in the position of a surety completing a contractual obligation of a defaulting contractor and performing an equitable duty to the United States. It is therefore entitled to subrogation to the rights of the United States in the fund. Subrogation does not arise through the contractor, but from the government's rights: Prairie State Bank v. U. S., 164 U.S. 227, [17 S.Ct. 142, 41 L.Ed. 412]; Henningsen v. U. S. Fid. & Guar. Co. of Baltimore, 208 U.S. 404, [28 S.Ct. 389, 52 L.Ed. 547]; In re Scofield, 215 Fed. 45. In Pennsylvania, where our statutes and the facts coincide with the cases decided by the federal courts, we are in harmony with those decisions as illustrated by Lancaster County National Bank's Appeal, 304 Pa. 437, [155 A. 859, 861].[16]

 In another case, Jacobs v. Northeastern Corp.,[17] Northeastern had entered into a contract with the Secretary of Highways for the construction of state roads. There, as here, the contract required a bond for the prompt payment of labor and material claims. When Northeastern defaulted on the payment of labor and material claims, the surety made the payment and petitioned the court for the amount due from the Commonwealth on the contract, which amount due was less than the amount actually paid out by the surety. Northeastern's receiver counterclaimed for the retained funds and contended that the surety was only entitled to its pro rata share as a general creditor and not to the entire amount due on the contract as a successor to the rights of the contractor. In part, the construction contract and bond, as noted by that court, also contained terms similar to those in the O'Brien and Redmond contracts, which created an express undertaking by the contractor to pay the labor and materialmen under the terms of the construction contract itself. The *Jacobs* court noted with approval the federal rule, as found in Pearlman v. Reliance Ins. Co.[18] that the surety, upon payment of labor and materialmen claims, is entitled to assert the benefits of subrogation against funds withheld by a public agency. Finding that the Department of Highways had an implied right to withhold moneys if it was determined that there were unsatisfied labor and material claims in breach of a condition of the contracts, that Pennsylvania court stated that these moneys must be paid to the surety, just as the fund would have gone to the labor and materialmen rather than to the general creditors even if there had been no bond, because the surety stands in the place of the persons

---

16. *Id.* at 96–97, 166 A. at 367.

17. 416 Pa. 417, 206 A.2d 49 (1965).

18. 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). This action involved a dispute over funds in the Government's possession, which funds were claimed both by the trustee of the bankrupt contractor and the surety on payment and performance bonds. These retained earnings would have been paid by the Government to the contractor had the contractor carried out its obligation to pay its laborers and materialmen. The surety had paid out approximately $350,-000.00 to discharge debts of the contractor for labor and materials; the fund held by the Government was approximately $87,000.00. The Court, finding that the property interest of the surety never became a part of the bankruptcy estate, and that the surety had the right to all of the fund, held: (1) that the Government had a right to use the retained fund to pay laborers and materialmen; (2) that the laborers and materialmen had a right to be paid out of the fund; (3) that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and (4) that the surety, having paid the laborers and materialmen, was entitled to the benefit of all those rights to the extent necessary to reimburse it.

whose claims it has paid. Therein, the Court stated:

> Payment to them [labor and materialmen involved in public construction] is secured by the bond of the contractor's surety. The funds available for the protection and payment of these claims are separate and apart from the relationship between the contractor and his general creditors. This is so irrespective of whether there exists a surety bond for payment. The execution of the surety bond for this special but well known purpose in no way involved or prejudiced the general creditors or the receiver.[19]

And, in discussing the question of whether the sureties are required to file financing statements under the U.C.C. in order to perfect a security interest which would prevail over general creditors, the Court held that no financing statements were required to be filed. In discussing this issue, the Court stated:

> None of the purposes or objectives of the Code's filing requirements would be served by holding that the subrogation to the contract balance now due is an assertion of a "security interest" and therefore subject to the filing provisions of Article 9. The contract balance withheld would never have become due and payable to Northeastern (or its receivers or creditors) as long as Northeastern defaulted on its obligation to pay labor and materialmen.

> . . . . . .

> Rights of subrogation, although growing out of a contractual setting and ofttimes articulated by the contract, do not depend for their existence on a grant in the contract, but are created by law to avoid injustice. Therefore, subrogation rights are not "security interests" within the meaning of

Article 9. The sureties' rights of subrogation, having been created by operation of law, are not the usual type of consensual security interests contemplated by the Code.[20]

In Atlantic Refining Co. v. Continental Cas. Co.,[21] another case decided under Pennsylvania law, it was held that the labor and material bond surety was subrogated to the contract balance. That Court, in part, stated:

> Thus, Henningsen . . . and Prairie State National Bank . . . pointed to in the Pennsylvania cases (Lancaster and Sundheim) as exemplifying the federal law with which Pennsylvania is in accord, clearly hold that in no-lien construction contracts [6], the owner has an equitable obligation to see that the materialmen are paid, and when the surety has paid them, the surety is subrogated to the rights of the owner in the withheld balances as of the date of the original contract.[22]

In the instant case, we reach the inescapable conclusion that at the time the petition in bankruptcy was filed, the State did not owe funds to O'Brien and Redmond. The bankrupt, by failure to make prompt payment on all material and labor claims, was in breach of its contract with State. We, therefore, agree with the opinion in Atlantic Refining Co. wherein the Court concluded that:

> Therefore, I am of the opinion that a failure by the Contractor here to pay for labor and materials is just as much a failure to perform and carry out the terms of the contract as an abandonment of the work would have been.[23]

By virtue of this breach, National, as surety on the six contracts, became legally liable for payment of the claims of the

---

19. Jacobs v. Northeastern Corp., 416 Pa. 417, 426, 206 A.2d 49, 53–54 (1965).

20. *Id.* 416 Pa. at 428–429, 206 A.2d at 54–55. *See* Home Indem. Co. v. United States, 433 F.2d 764, 193 Ct.Cl. 266 (1970).

21. 183 F.Supp. 478 (W.D.Pa.1965).

22. *Id.* 183 F.Supp. at 485.

23. *Id.* 183 F.Supp. at 482–483.

laborers and materialmen. This liability resulted in National's equitable subrogation to the fund which was less than the payments which National made on the claims under each contract. The equitable subrogation created rights in National to the fund which were superior to and apart from other creditors of the bankrupt in that the laborers and the materialmen had a right to be paid for their work on the contracts. Claimants could sue the surety under the payment bond for this money; the State could have used the fund to pay the laborers and materialmen except for the bond; and the surety, having paid the claimants to the fund in the hands of the State, would be entitled to the fund to the extent it reimbursed surety for the payments it had made to said laborers and materialmen. Moreovor, the subrogation right relates back to the date of the contract,[23a] and this right is neither pre-empted nor extinguished by the subsequent filing of bankruptcy.

Once O'Brien and Redmond failed to pay the claims of laborers and materialmen, it had no legal right to the fund in the hands of the State to the extent of such claims. Trustee claims to have title to the funds under Section 70 of the Bankruptcy Act, as amended, 11 U.S.C. § 110. Section 70 vests a trustee with the title of the bankrupt, as of the date of the filing of the petition in bankruptcy to, insofar as is herein applicable:

(a) . . . (5) property, including rights of action which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him, or otherwise seized, impounded or sequestered . . . (6) rights of action arising upon contracts, or usury, or the unlawful taking or detention of or injury to his property . . . . [24]

Trustee has cited no cases nor does our research indicate any case which would support the proposition that either O'Brien and Redmond or the Trustee, who stepped into the shoes of the bankrupt, would have had any right to judicially proceed against the State for the money up to the amount which would reimburse the Surety for the claims it had paid on the contract. Nor has the Trustee indicated any circumstance in which the bankrupt might have levied on the contracts once the failure of the bankrupt to pay the labor and materialmen occurred and the Surety's liability for these payments arose, at least not until the Surety was made whole for those payments. As set forth in Jacobs, this fund was an entity apart from the claims of general creditors, and a surety bond for protection of claimant labor and materialmen in no way prejudiced either the general creditors or the receiver. We are in accord with The Honorable Judge Weiner of this Court,[25] who found

---

23a. See note 22 and accompanying text *infra*; In re F. H. Donovan Painting Co., 220 F.Supp. 811, 822 (E.D.Mo.1963).

24. 11 U.S.C.A. § 110.

25. On September 22, 1967, the Trustee instituted a suit against National in the United States District Court for the Eastern District of Pennsylvania, Civil Action No. 43638, in which the Trustee claimed from National the sum of $114,616.55, which fund is the fund in controversy in the instant case which flows from the above-described nine contracts. The plaintiff Trustee claimed title to the fund under Section 70 of the Bankruptcy Act, as amended, 11 U.S.C.A. § 110. The defendant National filed a pre-answer motion to dismiss the complaint for failure to state a claim upon which relief could be granted, pursuant to Fed.R.Civ. P. 12(b)(6). On March 12, 1968, a Memorandum Opinion was filed in Civil Action No. 43638 by The Honorable Charles R. Weiner which ordered that the complaint of the plaintiff Trustee be dismissed for lack of jurisdiction. Therein, that Court considered that jurisdiction of the claim as invoked under Section 23 of the Bankruptcy Act, 11 U.S.C. § 46, would permit the Trustee in bankruptcy to bring or prosecute suits, unless the defendant consents, only in those courts where the bankrupt might have brought them if proceeding under that title had not been instituted, that the defendant did not consent to this suit, and that Sections 60 and 67 of the Bankruptcy Act, 11 U.S.C. §§ 96, 107, were not therein applicable. The Court lastly

that the money was not the "property" of the bankrupts in any legal sense of the term. Consequently, we also do not find that National is a trustee ex maleficio of the moneys it received from the State for the six contracts on which it was surety.

We next turn to the three contracts which were bonded by companies other than National. As to the Delaware County contract, on April 19, 1963 O'Brien and Redmond executed and delivered to National an Assignment of Claim to any award which would be granted O'Brien and Redmond by the Board of Arbitration under this contract. Financing Statements were then filed by National under the provisions of the U.C.C. on May 7, 1963 with the

found that Section 70 of the Bankruptcy Act, 11 U.S.C. § 110, in which title to many kinds of property is vested in a trustee, was not applicable to the funds claimed by the Trustee in that case, since even if the sum paid by State to National was to be considered as proceeds of the contractual debt between O'Brien and Redmond and State prior to the filing of this action, O'Brien and Redmond could not have judicially proceeded against the money and the funds were therefore not the "property" of the bankrupts in any accepted legal sense of that term. No appeal was taken by the Trustees to the dismissal of this action in the United States District Court.

There have been other legal proceedings surrounding the funds in issue in the case at hand. On December 11, 1963, a Petition in Involuntary Bankruptcy was filed against O'Brien and Redmond in the United States District Court for the Eastern District of Pennsylvania, as of Cause No. 28116. On December 30, 1963, said O'Brien and Redmond were adjudicated bankrupts.

On or about December 30, 1963, the Receiver of O'Brien and Redmond (the predecessor to Trustee in this action) filed a Petition, in Bankruptcy Cause Number 28116, to show cause why State should not turn over $111,739.39 to said Receiver, these funds being the funds in controversy in the instant case. The Petition alleged that there were substantial moneys due the bankrupts on the accounts receivables to which National and the Internal Revenue were not entitled, and requested that since all funds should be administered through the bankrupts' estate the State turn over all funds to the bankruptcy court. The aforesaid Petition, as amended, included all of the nine contracts described above. National filed answers to the aforesaid Petition and Amended Petition, in which it objected to the Summary Jurisdiction of the Bankruptcy Court on the grounds that the funds in question had never been in the actual or constructive possession of the bankrupts or of the Bankruptcy Court.

On May 20, 1964, the Referee in Bankruptcy, Thomas J. Curtin, filed his Opinion, Findings of Fact, Conclusions of Law and Order. Therein, he sustained the objections to the jurisdiction (summary) of the Bankruptcy Court under the provisions of Section 23 of the Bankruptcy Act (14th Ed. Colliers—Vol. 2, page 431 et seq.) which had been filed by State, Globe, Federal Government and National. The Trustee in Bankruptcy filed a Petition for Review by the United States District Court. On October 23, 1964, the aforesaid Court, by the Honorable John W. Lord, Jr., ordered that the Petition of the Receiver/Trustee for Turnover Order be dismissed on the basis of the Referee's Opinion. The Trustee appealed to the Court of Appeals for the Third Circuit. On August 17, 1965, said Court in a Per Curiam Opinion affirmed the decision of the District Court.

In addition, on April 3, 1968, which was less than a month after the Order of Judge Weiner, the Trustee instituted a suit against National and State in the Court of Common Pleas, Philadelphia County, Pennsylvania, claiming the sum of $114,616.65 from National. On August 28, 1968, the said Court of Common Pleas of Philadelphia County sustained preliminary objections filed by both National and Commonwealth. The Trustee appealed to the Pennsylvania Supreme Court, which, on an incomplete record, reversed the decision of the Court of Common Pleas and remanded to that Court for further proceedings. Martin v. National Surety Corp., 437 Pa. 159, 262 A. 2d 672 (1970). This said action is still pending before the aforesaid Court of Common Pleas, but the Trustee had agreed to discontinue said action if the United States District Court permitted intervention by the Trustee in the instant action.

On October 28, 1971, the Petition for Leave to Intervene was filed by the Trustee in the instant action, and on November 29, 1971, the aforesaid Petition for Leave to Intervene was granted by this Court.

Chester County Court, and on May 10, 1963 with the Secretary of the Commonwealth. National had thus perfected a security interest in this fund in accordance with the U.C.C. by May 10, 1963.[26] The Petition in Bankruptcy was not filed until December 11, 1963, which date was more than four months subsequent to the perfection of the security interest, precluding a question here of a voidable preference[27] against the Trustee. The amount which was paid by State to National on this contract was $18,679.36 from which National has disbursed $6,345.31 to Hanover and Saul, Ewing, leaving a balance of $12,334.05 in National's hands. The security interest in the $12,334.05 was perfected sufficiently early in time to create a priority over any claim by the Trustee.[28] National, therefore, is entitled to retain the sum of $12,334.05 against any claim of the Trustee.

As to the Delaware, Beaver and Erie County Contracts, State paid to National as the balance due on these contracts the sum of $52,993.13. After payments to Hanover and Saul, Ewing, the amount remaining in National's hands is $22,211.82, and, after National's projected payment to Globe,[29] we arrive at the sum of $14,702.83 as the balance of the funds paid to National by State, which arose from these three contracts not bonded by National. In a General Indemnity Agreement, executed by O'Brien and Redmond to National on September 26, 1960, O'Brien and Redmond, as Indemnitors, assigned, pledged, conveyed and transferred to National, in the event of any failure to pay for labor and materials used in the prosecution of a contract bonded by National, its right, title and interest in and to all sums due or to

become due on all other contracts, bonded or unbonded, in which the Indemnitors had an interest. The nine construction contracts between O'Brien and Redmond and State were entered into between the dates of April 28, 1958 and June 7, 1961, the Delaware, Beaver and Erie county contracts were completed between April 28, 1960 and November 9, 1961; a Financing Statement on the General Indemnity Agreement was filed by National with the Secretary of the Commonwealth on May 17, 1962 and with the Chester County Court on July 9, 1962; by March 25, 1962 the liability of National had matured in respect to claims on the Somerset-Route 55144, Somerset-Route 55028, Bedford, Bradford and Cambria County contracts in the amount of approximately $42,498.97; and the total amount received by National from State on the six contracts between State and O'Brien and Redmond which were bonded by National was the sum of $61,623.52, although National has, to date, paid to claimants under these six contracts the amount of $159,629.54.

█ As we have shown earlier, the sureties on these contracts had subrogation rights which were superior to any rights claimed by an assignee of the contractor.[29a] These sureties were thus entitled to the amounts left in State's hands up to the amount which the sureties had paid out on the labor and materialmen claims. As to any excess of funds left in State's possession after the sureties are reimbursed, and inasmuch as both National's claim and the Trustee's claim to this fund are derived from the contractor's title to the fund, National, under the facts of this case, clearly has rights to these funds which are per-

26. 12A P.S. § 9–401. O'Brien and Redmond's principal place of business was in Chester County. There is no contention by any party that this Security Interest was not perfected.

27. Bankruptcy Act § 60, 11 U.S.C.A. § 96.

28. 12A P.S. § 9–301.

29. National is willing to pay the sum of $7,508.99 to Globe, provided there is a determination by this Court that neither

Federal Government nor Trustee have rights prior to Globe in respect to the contract balance on Erie County. Memorandum on Behalf of National Surety Corporation's Motion for Summary Judgment at 13. Moreover, Globe has a legal right to this sum.

29a. As to the relative rights of assignee and surety, see J. McBridge & I. Wachtel, Government Contracts, § 16.50[1] (1971).

fected prior in time to and, therefore, are superior to any rights which the Trustee-Intervenor has. National has a perfected security interest in these funds, and, again, there is no question here of a voidable preference since the Financing Statements were filed well over a year prior to the filing of the Petition in Bankruptcy. National is, therefore, entitled to retain any of the excess of the fund on the Delaware, Beaver and Erie County contracts up to the amount necessary to reimburse National for the losses sustained on the six contracts which it bonded and to retain this fund as against any claim of the Trustee after the claims of the sureties on those three contracts have been paid.

## II. FEDERAL GOVERNMENT

O'Brien and Redmond owed certain withholding, F.I.C.A. and unemployment taxes for the third and fourth quarters of 1961, and for the first, second and third quarters of 1962 which totaled $64,708.71 exclusive of interest. Federal Government made assessment and notice and demand on the third and fourth quarter taxes of 1961 on June 26, 1962; on the first quarter taxes of 1962 on June 25, 1962; on the second quarter taxes of 1962 on August 10, 1962; and on the third quarter taxes of 1962 on November 16, 1962. Federal Government then filed notices of the federal tax lien with the office of the Prothonotary of Chester County, Pennsylvania: relating to the third and fourth quarter taxes of 1961 and the first quarter taxes of 1962 on August 10, 1962; relating to the second quarter taxes of 1962 on October 31, 1962; and relating to the third quarter taxes of 1962 on February 9, 1963. Then, on May 6, 1963, State was served with a notice of levy in regard to the federal tax assessments against O'Brien and Redmond which was for the assessment of $64,708.71 plus interest to that date of notice of levy which made the total amount of the notice of levy for $68,385.73. The State made no payment to the Federal Government by reason of the levy, and the action at hand was

brought on December 29, 1970 in which Federal Government claims the amount of $52,993.13 plus interest against State as the sum which was allegedly due from State to O'Brien and Redmond as of May 6, 1963 on the Delaware, Beaver and Erie County construction contracts. Federal Government in its complaint against State has alleged: that despite assessments against O'Brien and Redmond for unpaid withholding taxes, penalties and interest and notice and demand for payment, the aforesaid taxes remain unpaid; that as of May 6, 1963, the date of the service of a notice of levy by the U.S.A. upon the State, the State was indebted to O'Brien and Redmond in the total amount of $52,993.13, which sum represented the total amount due those taxpayers on the three construction contracts in Delaware, Beaver and Erie Counties; that the property or right to property, to wit, the sum of $52,993.13, belonging to the taxpayers was not subject to an attachment or execution under any judicial process at the time of the aforesaid levy; and that, therefore, the State is indebted to the Federal Government in the amount of $52,993.13 plus interest as provided by law.

State has denied that it was indebted to O'Brien and Redmond in any sum as of May 6, 1963 because, by reason of the default of O'Brien and Redmond in the payment of labor and material claims and by reason of O'Brien and Redmond's assignments to National and National's filing of the appropriate Financing Statements, there were no funds due from State to O'Brien and Redmond as of May 6, 1963. State has also denied that this Court has jurisdiction in respect to a suit against the Commonwealth of Pennsylvania and avers that as a sovereign state the Commonwealth is immune, without its consent, from suit or from a notice of levy by Federal Government.

First, as to the issue of jurisdiction, the law is that while a state, without its consent, is immune from suit

by an individual,[30] that state, by its membership in the federal system, has impliedly consented to the judicial resolution of those controversies between it and the United States.[31] Under section 6332 of the Internal Revenue Code of 1954,[32] a State is included within the term "person" as it is used in that statute, and that state can be liable to the United States for failure to honor a federal levy for personal income tax of state employees.[33] We, therefore, conclude that defendant's allegation that it, as a sovereign state, is immune from suit by the Federal Government without its consent for failure to honor a federal tax levy is without merit.

Secondly, Federal Government contends that pursuant to Section 6331 of the Internal Revenue Code of 1954,[34] the May 6, 1963 levy seized all property and rights to property belonging to the taxpayers, O'Brien and Redmond, which was in possession of the State at the time of the levy.

When any person refuses to pay any tax, the amount of the tax becomes a federal lien upon all property and right to property which belongs to that person.[35] The government can collect the tax by a levy upon that property or rights to property which belongs to the taxpayer[36] even though his property or right to property is in the possession of another person, as long as that property or property right was not, at the time of the demand, subject to an attachment or execution under any judicial process.[37] This federal lien arises at the time the assessment is made,[38] however, it is val-

---

30. Principality of Monaco v. Mississippi, 292 U.S. 313, 54 S.Ct. 745, 78 L.Ed. 1282 (1934).

31. United States v. Louisiana, 339 U.S. 699, 70 S.Ct. 914, 94 L.Ed. 1216 (1950); United States v. Texas, 143 U.S. 621, 12 S.Ct. 488, 36 L.Ed. 285 (1892); United States v. Newhard, 128 F.Supp. 805 (W.D.Pa.1955).

32. Section 6332 provides in pertinent part that:

(a) [A]ny person in possession of (or obligated with respect to) property or rights to property subject to levy upon which a levy has been made shall, upon demand of the Secretary or his delegate, surrender such property or rights (or discharge such obligation) to the Secretary or his delegate, except such part of the property and rights as is, at the time of such demand, subject to an attachment or execution under any judicial process.

. . . . .

(e) . . . The term "person," as used in subsection (a), includes an officer or employee of a corporation or a member or employee of a partnership, who as such officer, employee, or member is under a duty to surrender the property or rights to property, or to discharge the obligation. 26 U.S.C.A. § 6332.

33. Commonwealth of Massachusetts v. United States, 296 F.2d 336 (1st Cir. 1961).

34. Section 6331 provides in part as follows:

(a) . . . If any person liable to pay any tax neglects or refuses to pay the same within 10 days after notice and demand, it shall be lawful for the Secretary or his delegate to collect such tax . . . by levy upon all property and rights to property . . . belonging to such person or on which there is a lien provided in this chapter for the payment of such tax.

(b) . . . The term "levy" as used in this title includes the power of distraint and seizure by any means. A levy shall extend only to property possessed and obligations existing at the time thereof. 26 U.S.C.A. § 6331.

35. Section 6321 provides that:

If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount . . . shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person. 26 U.S.C.A. § 6321.

36. 26 U.S.C.A. § 6331. See note 33 *supra*.

37. 26 U.S.C.A. § 6332. See note 31 *supra*.

38. Section 6322 provides that:

[T]he lien imposed by section 6321 shall arise at the time the assessment is made and shall continue until the liability for the amount so assessed (or a judgment against the taxpayer arising out of such liability) is satisfied or becomes unenforceable by reason of lapse of time. 26 U.S.C.A. § 6322.

id against any purchaser, holder of a security interest, mechanic's lienor or judgment lien creditor only after notice of the lien has been filed.[39]

Thus, in order to defeat the Federal Government's contention that the $52,993.13 levied upon, which was in the possession of State, and which related to the Delaware, Beaver and Erie County contracts, was property or a right to property of O'Brien and Redmond, State may assert as a defense to this allegation either that any property or rights to property of the taxpayers, which was in the possession of State at the time of the levy and which was not exempt from the levy,[40] was subject to an attachment or execution under judicial process at the time the levy was served,[41] or that the State did not hold any property or rights to property of the taxpayers on the date of the levy.[42]

State in its answer to plaintiff's complaint admitted that any property right which O'Brien and Redmond might have in the funds then being held by State was not subject to attachment or execution under any judicial process.[43] We, therefore, must next consider the question of whether State had in its possession any property or right to property of O'Brien and Redmond.

In answering the question of whether a taxpayer had property or rights to property to which a tax lien could attach, both federal and state courts must look to State law.[44] Under Pennsylvania law O'Brien and Redmond had no property or right to property in the proceeds held by State as the contract balances on the Delaware, Beaver and Erie County contracts to the extent of the claims for labor and materials which were paid by the respective sureties under the bonds on those contracts. Indeed, Federal Government has not claimed that the amounts paid to National by State on the six contracts for which National was surety was not due to National under National's right of subrogation. The reasoning heretofore used in discussing National's rights as a surety apply equally to the rights of subrogation of Globe and Hanover on these three contracts. In short, when O'Brien and Redmond failed to pay labor and material claims, thus breaching its contract with State, Hanover and Globe become legally liable for the payment of the labor and materialmen and they were thus subrogated to the rights in the fund to the extent of the payments made by them to the various claimants. These rights of the surety were superior to any rights of any other creditor of the bankrupts and related back to the date of the construction contract with State. We agree with the court in *Atlantic Refining Co.* which said:

In the instant case, I conclude that the Contractor had no "property" or "right to property" in the withheld

**39.** Section 6323 provides in pertinent part that:

(a) . . . The lien imposed by section 6321 shall not be valid as against any purchaser, holder of a security interest, mechanic's lienor or judgment lien creditor until notice thereof which meets the requirements of subsection (f) has been filed by the Secretary or his delegate.

. . . . .

(h) Definitions . . . .

(1) Security Interest.—The term "security interest" means any interest in property acquired by contract for the purpose of securing payment or performance of an obligation of indemnifying against loss or liability. A security interest exists at anytime (A) if, at such time, the property is in existence and the interest has become protected under local law against a subsequent judgment lien arising out of an unsecured obligation, and (B) to the extent that, at such time, the holder has parted with money or money's worth. 26 U.S.C.A. § 6323.

**40.** 26 U.S.C.A. § 6334.

**41.** 26 U.S.C.A. § 6332.

**42.** United States v. Metropolitan Life Ins. Co., 36 F.Supp. 399 (E.D.Pa.1941).

**43.** Defendant's Answer to Plaintiff's Complaint at 2.

**44.** Aquilino v. United States, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960).

**1388**

balance which the Owner paid into court, and, therefore, there was nothing to which the government's lien could attach.[45]

▇▇▇▇▇ The fact that State failed to pay the respective sureties directly, but instead paid that amount to National which in turn paid or will pay the subrogation amounts to Globe and Hanover does not act to create property rights in O'Brien and Redmond where none previously existed as to those amounts. The Delaware, Beaver and Erie contracts had been completed by the time of the federal tax assessment, and the laborers and materialmen on those contracts had the equitable right to be paid for their duties performed or materials supplied to said contracts. Furthermore, whenever an employer withholds taxes from an employee's wage, the employer remains liable to the government for the tax; that tax is owing to the Government as taxes and not as wages; consequently, these taxes withheld by the employer-contractor are not payable by the surety under the bonds.[46] The Federal tax lien, moreover, can only extend to the property in which the taxpayer had an interest.[47] O'Brien and Redmond had no interest in these funds to the extent of the subrogation rights of Globe and Hanover, and, accordingly, the levy of the Federal Government against the State is invalid to the extent of these amounts which State paid to National.

We next turn to the questions of what liens were present on the balance of the funds held by State on the three contracts not bonded by National for which, after subtracting the amounts due the sureties by their subrogation rights, O'Brien and Redmond had property rights.

The first lien claimed was that by Saul, Ewing. Saul, Ewing was the legal firm for O'Brien and Redmond prior to the Adjudication in Bankruptcy, and these legal services were principally performed by the late Walter Biddle Saul, Esquire, who expired on August 30, 1966. These legal services rendered on behalf of O'Brien and Redmond on the Delaware, Beaver and Erie County contracts extended from early 1960 until mid-1963, when an agreement was reached on these three contracts in settlement of the litigation brought by Saul, Ewing, on behalf of O'Brien and Redmond, against State before the Board of Arbitration. These legal services were the effective cause of the payments by State of the balances on the aforesaid three contracts, and, by reason of the said services, Saul, Ewing asserted a Charging Lien and Retaining Lien against the funds which had been paid by State to National. During late 1965 and 1966, after arms-length negotiations between Saul, Ewing and National regarding the amount which would be payable to Saul, Ewing for its fees in connection with the legal services it had rendered to produce the funds which were realized by O'Brien and Redmond from the Commonwealth, the amount of the fee and expenses was agreed upon. The total amount for the three contracts was $11,000.00, of which $10,000.00 was for counsel fees and $1,000.00 was for expenses. On February 9, 1967, in reliance on and in consideration of a Letter of Indemnity, National paid to Saul, Ewing the sum of $10,100.00 in payment of their alleged Charging Lien and Retaining Lien against the funds received by National on the aforesaid three contracts. This was the sum of $11,000.00 minus $900.00, which Saul, Ewing had in November of 1962 agreed to repay to National from any fee received by that firm for services in raising the fund if National would advance the $900.00 to

---

45. 183 F.Supp. 478, 483 (W.D.Pa.1965). See Van Etten v. New York State Natural Gas Corp., 192 F.Supp. 837 (M.D.Pa.1961).

46. United States v. Crosland Constr. Co., 217 F.2d 275 (4th Cir. 1954) ; General

Cas. Co. v. United States, 205 F.2d 753 (5th Cir. 1953) ; United States Fidelity & Guar. Co. v. United States, 201 F.2d 118 (10th Cir. 1952).

47. United States v. Burgo, 175 F.2d 196 (3d Cir. 1949).

the account of O'Brien and Redmond with the Internal Revenue Service, said $900.00 being returnable from the fee on the Delaware County contract. All parties to this action except Federal Government have stipulated that Saul, Ewing had a lien to retain said fees and costs from the funds produced by its services for O'Brien and Redmond and that a summary judgment may be entered in these proceedings in favor of Saul, Ewing. We have found that Saul, Ewing had a Charging Lien on these funds.

In an early case, Trustees v. Greenough,[48] the complainant was allowed his reasonable counsel fees incurred in the reclaiming of a trust fund and causing said fund to be subjected to the purposes of the trust. In its reasoning, the Court stated:

> The rule that a party who recovers a fund for the common benefit of creditors is entitled to have his costs and expenses paid out of the fund, prevails in bankruptcy cases.[49]

And later in the opinion, the Supreme Court, in part, reasoned as to railroad mortgages where the fund was in the hands of receivers or trustees, that:

> [I]t has been the common practice, as well in the courts of the United States as in those of the States, to make fair and just allowances for expenses and counsel fees to the trustees, *or other parties*, promoting the litigation and securing the due application of the property to the trusts and charges to which it was subject.[50]

In *Harris' Appeal*,[51] the question before the Pennsylvania court was whether the attorney for an owner of real estate which had been taken in condemnation proceedings had any claim upon the award of compensation to said owner for the reasonable value of his services and costs of litigation as against the mortgagee of the property. There was present in this case a letter agreement between the property owner and the attorney that the latter's fee would be "ten per cent. of the gross amount collected from the city for this condemnation."[52] The mortgagee bank, which had had notice of the proceedings, claimed that even though the property owner was now insolvent the attorney must look to the owner for his fees and costs and that the bank's lien on the fund by virtue of its mortgage was superior to the claim of anyone through or under the owner. In allowing the attorney a reasonable fee for his services in the condemnation proceedings, the Pennsylvania Supreme Court stated, in pertinent part:

> Our decisions establish that in carrying on this type of litigation and securing a proper award the property owner sustains a trust relationship as to creditors possessing liens on the property, sufficient to entitle the latter to equitable aid in enforcing such liens upon timely intervention in the proceedings.[53]

. . . . . .

> Appellants do not contend that Jacoby has an ordinary common-law or *retaining* lien upon the fund which the city is now prepared to pay, and which has been substituted for the condemned land. Such a lien is dependent upon possession by the attorney and binds only money, papers or other property in his hands . . . On the other hand, the right of an attorney to a *charging* lien upon a fund in court or otherwise applicable for distribution on equitable principles, which his services primarily aided in producing and to which, by agreement with his client, he is to look for compensation, has long been recognized by the authorities.[54]

. . . . . .

---

48. 105 U.S. 527, 26 L.Ed. 1157 (1881).

49. *Id.* 105 U.S. at 534.

50. *Id.* 105 U.S. at 536.

51. 323 Pa. 124, 186 A. 92 (1936).

52. *Id.* 323 Pa. at 126, 186 A. at 93.

53. *Id.* 323 Pa. at 127, 186 A. at 94.

54. *Id.* 323 Pa. at 128–129, 186 A. at 94.

Under the authorities cited, where the attorney's client, for whom the services were in the first instance rendered, stands on an equal footing with other claimants to the fund, or the latter derive their rights through the owner of the property which gave rise to it, the equitable right of the attorney will be sustained. We will go farther and say that even where a lien creditor, such as the mortgagee in the case before us, has a claim upon the property superior to the owner's, yet, if his interest in the fund created, which the owner is primarily entitled to collect, is substantially identical with that of the owner, and the fund is realized solely through the efforts of the owner's attorney, who agrees to look to the fund for his compensation, the lien creditor must yield his claim to the attorney's reasonable claim for compensation and must yield his claim also to the payment of the legal costs.[55]

These requirements which must be met before an equitable charging lien will be recognized and applied were set forth by the Pennsylvania Supreme Court in Recht v. Clairton Urban Redevelopment Auth.[56] as follows:

(1) [T]hat there is a fund in court or otherwise applicable for distribution on equitable principles, (2) that the services of the attorney operated substantially or primarily to secure the fund out of which he seeks to be paid, (3) that it was agreed that counsel look to the fund rather than the client for his compensation, (4) that the lien claimed is limited to costs, fees or other disbursements incurred in the litigation by which the fund was raised and (5) that there are equitable considerations which necessitate the recognition and application of the charging lien.[57]

There was present in "court" a fund to which the attorney's lien could apply. The Pennsylvania Board of Arbitration has been designated by statute as the tribunal before which claims against State arising from contracts entered into by the State are to be heard.[58] Moreover, the fund produced by the services of Saul, Ewing was in connection with and as a result of the proceedings before this board. The fund involved was substantial, and a substantial amount of time and effort was involved by Saul, Ewing on behalf of O'Brien and Redmond in producing the fund by settlement of the litigation before the Board of Arbitration. In addition, we can find that there was an agreement, even though impliedly, that counsel look to the funds rather than to the client for compensation. By June of 1962, National was countersigning checks with O'Brien and Redmond for the payment of claims of laborers and materialmen. As a result of the financial difficulties of O'Brien and Redmond, of which Saul, Ewing as counsel for O'Brien and Redmond was well aware, Saul, Ewing did not expect at the time it was performing its said services for O'Brien and Redmond that it would be able to collect its fees and costs for its services from O'Brien and Redmond directly, but rather that Saul, Ewing would have to look for recovery of its fees and costs to any fund which it might produce for O'Brien and Redmond through its services.[59] Because of the death of Mr. Saul, no express agreement can be shown at this time; however, it is reasonable to find an implied agreement between Saul, Ewing and O'Brien and Redmond that the attorneys' fee would be paid from the fund produced by those services, since it is obvious from the records that no other source was available for payment of the fee and that, even in 1962 O'Brien and Redmond was unable to pay

---

55. *Id.* 323 Pa. at 134, 186 A. at 97.

56. 402 Pa. 599, 168 A.2d 134 (1961). *See* Penn Mutual Life Ins. Co. v. Finkel, 428 Pa. 11, 235 A.2d 396 (1967).

57. *Id.* 402 Pa. at 608, 168 A.2d at 138–139.

58. 72 P.S. § 4651 et seq.

59. See Saul, Ewing's Affidavit Sur Motion for Summary Judgment at 2.

all of its bills. The lien claimed by Saul, Ewing was limited to costs and fees incurred in the litigation by which the fund was raised, and was certainly reasonable considering the services performed and the time expended. Equity and justice require that this Court recognize this charging lien.

Another lien which was asserted on the funds held by State as against the Delaware, Beaver and Erie County contracts of O'Brien and Redmond was the security interest [60] of National in these funds. On September 26, 1960, O'Brien and Redmond executed and delivered to National a General Indemnity Agreement which provided in part that O'Brien and Redmond assigned, transferred, pledged and conveyed to National all right, title and interest in and to all sums due or to become due on all other contracts in which it had an interest in the event that it (O'Brien and Redmond) failed to pay for labor and materials used in any contract which was bonded by National. Between April 28, 1958 and January 27, 1960, Commonwealth and O'Brien and Redmond entered into the three construction contracts which were not bonded by National, and between May 23, 1961 and June 7, 1961 they entered into the six construction contracts which were bonded by National. The three contracts not bonded by National and on which Federal Government has filed suit were completed between April 28, 1960 and November 9, 1961, and National acquired

rights in these contract balances at this time, because in 1961 O'Brien and Redmond failed to pay laborers and materialmen, and multiple claims were made against National as surety on the Wyoming-Susquehanna, Bradford, Somerset-Route 55144, and Somerset-Route 55028 County contracts. National as surety paid the earliest claimant on November 16, 1961. National's security interest in the contract balances due O'Brien and Redmond on the three contracts not bonded by National would have attached [61] during this period of time under the provisions of the General Indemnity Agreement. Under Pennsylvania law, this security interest was perfected by recordation in the appropriate offices on May 17, 1962 and July 9, 1962.[62]

O'Brien and Redmond had property rights to a part of the $52,993.13 which was paid by State to National on the three contracts, and under state law there were liens on this right to property in the form of a statutory lien of Federal Government, a charging lien of Saul, Ewing and a perfected security interest of National. We, therefore, next consider the relative priority of these liens.

The priority of a federal tax lien in regard to other liens is a question of federal law.[63] Under federal law, as against a recorded federal tax lien, the determination of the priority of liens when the debtor at that time is not insolvent [64] is determined by the doctrine

---

60. The term "security interest" means: [A]n interest in personal property or fixtures which secures payment or performance of an obligation . . . . The term also includes any interest of a buyer of . . . contract rights which is subject to Article 9.
12A P.S. § 1–201(37).

61. 12A P.S. § 9–204.

62. *See* 12A P.S. § 9–401. It is noted that, while all parties stipulated that July 9, 1962 was the date the Financing Statement was filed with the Chester County Court, said Financing Statement as submitted by the parties to this action in support of the aforesaid stipulation of fact is dated June 9, 1962. However, this

difference of one month in the date of filing is not material to our decision.

63. Aquilino v. U. S., 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960); New Jersey v. Moriarity, 268 F.Supp. 546 (D.C. N.J.1967).

64. United States v. City of New Britain, 347 U.S. 81, 85, 74 S.Ct. 367, 370, 98 L.Ed. 520 (1954). U.S.A. has levied under 26 U.S.C.A. § 6331 because at the time the federal lien attached, O'Brien and Redmond were not yet insolvent. Had the debtors been insolvent, Federal Government would have had clear priority of the federal tax lien by virtue of 31 U.S.C.A. § 191.

of "first in time, first in right." [65] This determination is made by examining the state lien to ascertain if the lien is specific and perfected, or choate for priority purposes, in that the identity of the lienor, the property subject to the lien and the amount of the lien are established and there is nothing more to be done.[66] The priority of each statutory lien thus depends on the time the lien attached to the property in question and became choate. The federal tax liens, being statutory liens, take preference over inchoate and unperfected liens.[67]

In United States v. R. F. Ball Const. Corp.[68] the question before the Court was whether a subcontractor's *assignment* to his surety (not subrogation) of all sums to become due for performance of the subcontract, as security for any liability thereafter incurred by the subcontractor to the surety, was a mortgage of those sums within the meaning of the Internal Revenue Code of 1939, as amended, § 3672(a),[69] and thus gave the subcontractor a prior right to the fund over subsequently filed federal tax liens. The assignment had been given to the surety prior to the effective date of the federal lien; however, prior to the effective date of the federal lien the surety had made no payments and the Court therein held that the instrument was inchoate and unperfected.

The *Ball* case was distinguished in Hoare v. United States,[70] however. *Hoare* dealt with a chattel mortgage which had been given by debtors as security for their performances under a lease and which was filed prior to the effective date of the federal lien. That court, in holding that the chattel mortgage had priority over the federal lien, distinguished *Ball* partly on the grounds that the encumbrance was a mortgage, but more particularly as follows from that opinion:

However that may be, neither of the assignments under consideration in Ball were given to secure an indebtedness which to any extent matured before the tax lien attached. The assignments were given to protect a bonding company with regard to the *potential* liability it assumed under two performance bonds. *There was no failure of performance giving rise to actual liability until after the tax lien was filed.* The liability for which the assignment had been given was thus contingent and unliquidated when the tax lien attached.

*In the instant case liability had already arisen to the extent of arrearages existing when the tax levy attached.* The fact that the lessees might have thereafter extinguished this liability by paying the arrearages did not render such liabilities either contingent or unliquidated (emphasis added).[71]

*Ball* was also distinguished in Logan Planing Mill Co. v. Fidelity and Casualty Co.,[72] wherein contracts had been assigned as security for a surety in 1959, the government's liens had occurred in August and December of 1960, and payments by the surety had occurred from

---

65. United States v. First Nat'l Bank & Trust Co., of Fargo, N.D., 386 F.2d 646 (8th Cir. 1967).

66. *See* United States v. Equitable Life Assurance Society, 384 U.S. 323, 86 S.Ct. 1561, 16 L.Ed.2d 593 (1965); United States v. City of New Britain, 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520 (1954); United States v. Cohen, 271 F.Supp. 709 (S.D.Fla.1967).

67. United States v. Security Trust & Savings Bank, 340 U.S. 47, 71 S.Ct. 111, 95 L.Ed. 53 (1950).

68. 355 U.S. 587, 78 S.Ct. 442, 2 L.Ed.2d 510 (1958).

69. This Statute, in pertinent part, provided that: "Such lien shall not be valid as against any mortgagee, pledgee, purchaser, or judgment creditor until notice thereof has been filed by the collector . . . ."

70. 294 F.2d 823 (9th Cir. 1961).

71. *Id.* 294 F.2d at 828.

72. 212 F.Supp. 906 (S.D.W.Va.1962)

September of 1960 to May of 1961. That court also held that the surety's claim had priority over the lien of the government and stated:

> The Government also says that the claim of Planing Mill and Surety cannot be honored because they were inchoate, citing United States v. R. F. Ball Construction Co., 355 U.S. 587, 78 S.Ct. 422, 2 L.Ed.2d 510. But this case is not analogous to Ball. Here we do not have an assignment to secure a future contingent indebtedness, but an assignment to prevent a future indebtedness, an assignment of a known, fixed sum in trust for application to particular claims.[73]

We find that National's lien was completely choate and perfected under federal law. In neither *Hoare* nor *Logan*, which were decided subsequent to *Ball*, had an actual payment been made by the secured party prior to the effective date of the federal lien. Each claim of the secured party, nevertheless, was held to be sufficiently choate to give it priority over a federal lien. In the case at hand, by June 25, 1962, the earliest date on which the Federal Government made Assessment and Notice and Demand, the General Indemnity Agreement had been executed, the Delaware, Beaver and Erie contracts had been completed, fixed sums were admittedly due under these contracts, claims against National on the six contracts which it had bonded had already been made in sums certain, National had already paid out one claim and had fixed liabilities on others totaling approximately $25,132.78, and National had filed appropriate Financing Statements on the General Indemnity Agreement. Therefore, the identity of the lienor, the property subject to the lien and the amount of the lien had been established, and there was nothing more to be done to perfect National's lien against the contract balances.

National's lien being choate, it was a valid security interest under federal law as well as state law. This security interest was clearly prior to the claim of Federal Government on the three contracts, since the earliest date the Federal Government's levy could be valid as against the holder of this security interest[74] was October 10, 1962, when a notice of lien was filed by Federal Government. Therefore, any right to property which O'Brien and Redmond might have had in the funds now belonged to National. The Federal Government's levy was not made on any rights to property which O'Brien and Redmond still had; State was not in error in paying the funds to National instead of to Federal Government; and State cannot be held to be liable to the Federal Government for failure to honor the federal tax levy, as there were no funds due from State to O'Brien and Redmond on May 6, 1963.

As between National and Globe, Globe had subrogation rights to the fund which were higher than any security interest in said fund by National; National is, therefore, liable to Globe for the amount Globe paid out on labor and material claims on the Erie County contract. In addition, under Pennsylvania law, as between the charging lien of Saul, Ewing and the security interest of National: Saul, Ewing's lien is superior on the fund which its services secured, and National has correctly paid this lien and is given credit for the amount so paid.

We will discuss neither the defenses of State, to wit, laches and the failure of Federal Government to allege that a Warrant of Distraint was served on State, nor will we discuss National's defense of res judicata as against the Trustee, having preferred to reach a decision on the merits in this case.

For the foregoing reasons, we deny Trustee's request for summary judgment against National and grant National's request for Summary Judgment against

---

73. *Id.* 212 F.Supp. at 914.

74. 26 U.S.C.A. § 6323.

both State and Trustee. State, not being indebted to O'Brien and Redmond at the time of Federal Government's levy, cannot now be liable to Federal Government for the failure to honor said levy, and we, therefore, grant State's motion for summary judgment against Federal Government and deny Federal Government's motion for summary judgment against State. Saul, Ewing, by virtue of its charging lien in the funds, is entitled to judgment against a claim by any party and is entitled to retain the sum paid for its fees and services. Hanover, by virtue of its subrogation rights is entitled to summary judgment against the claim of any party.

Accordingly, the following Order is entered.